In re ADANA MORTGAGE BANKERS, INC., Debtor.

GOVERNMENT NATIONAL MORTGAGE CORPORATION, Plaintiff,

v.

ADANA MORTGAGE BANKERS, INC., Defendant.

Bankruptcy No. 80–00324A.
Adv. No. 80–0273A.

United States Bankruptcy Court,
N. D. Georgia,
Atlanta Division.

Aug. 15, 1980.

David Epstein, Kenneth Oestreicher, Attys., Civ. Div., Dept. of Justice Washington, D.C., for plaintiff.

Carr, Abney, Tabb & Schultz, Benjamin C. Abney, Atlanta, Ga., for defendant.

## OPINION

WILLIAM L. NORTON, Jr., Bankruptcy Judge.

This case is before the Court on a complaint by the Government National Mortgage Association ("GNMA"), Plaintiff, for relief from the automatic stay to terminate certain executory contracts between GNMA and the debtor. A hearing was held at which the debtor opposed GNMA's complaint and The First National Bank of Atlanta, the largest creditor of the debtor, intervened in support of GNMA's position. The parties have filed briefs and the Court took the case under advisement. The automatic stay was kept in effect by two interim Court orders while the Court had the matter under consideration.

### FINDINGS OF FACT

Debtor is a mortgage banker primarily engaged in originating or purchasing mortgage loans which it then forms into "pools" of approximately one million dollars in value. Pursuant to agreements (sometimes referred to as the "Guaranty Agreements," as the "servicing agreements" or as the "Agreements") between Debtor and GNMA, these mortgage pools then become the basis for the issuance of mortgage-backed securities issued by the Debtor and guaranteed by GNMA pursuant to authority granted by Section 306(g) of the National Housing Act, codified at 12 U.S.C. Section 1721(g). A separate Guaranty Agreement is executed between Adana and GNMA with respect to each "pool" of mortgages. The securities (sometimes referred to as "Certificates") issued for each pool of mortgages are then sold by Adana to investors in the marketplace, who receive a monthly return from the issuer equivalent in amount to the principal received on the mortgages in the pool, plus a specified rate

of interest set forth on the securities. The issuer, Adana, then functions as servicer of the mortgages and securities; it uses the money it receives from the individual mortgagors in each pool to pay the monthly payments to its certificate holders. In the event of a shortfall in receipts from the underlying mortgages, the issuer is, nevertheless, responsible for paying the full amount due to the security holders promptly by the fifteenth day of each month. Although the issuer will recover any payment of its own funds if it eventually recovers the delinquent payments from the underlying mortgagors, there is no assurance that such funds paid out by the issuer will be recovered. The issuer also collects tax and insurance escrows from the individual mortgagors and pays the taxes and insurance on the mortgaged properties as they become due. For all of these services the issuer collects a servicing fee based upon a percentage of the payments received from the mortgagors.

GNMA is a corporation, wholly owned by the United States government, under the control and management of the Secretary of HUD. GNMA was created in 1968 to take over certain of the secondary mortgage market operations of the Federal National Mortgage Association ("FNMA") and to carry on the mortgage-backed securities program. All of the benefits and burdens incident to the administration of GNMA inure to the Secretary of the Treasury, after expenses and reserves.

One of the numerous documents required to be submitted by the Debtor to GNMA prior to the issuance of GNMA certificates is a Guaranty Agreement, which is the primary document setting forth the relationship between the Debtor, as issuer of the GNMA certificates, and GNMA, as the guarantor of the certificates. The Guaranty Agreement provides that GNMA will pay the amounts due on the certificates, should the issuer fail to do so. Pursuant to the Guaranty Agreement GNMA (a) takes unrecorded assignments of the mortgages, (b) requires the establishment of custodial bank accounts for the receipts of principal, interest, and escrow funds from the individual mortgagors, (c) requires all the mortgage loan documents to be held by an independent custodian, and (d) charges a guaranty fee based upon a percentage of the servicing fee collected by the servicer.

The Guaranty Agreement provides that two specified events are automatic events of default by the issuer: (1) failure to make monthly payments on the certificates as they become due and (2) the application by the issuer for an advance from GNMA to pay the certificate holders. The Guaranty Agreement also sets forth numerous other obligations of the issuer which, may, upon written notice from GNMA to the issuer, be declared events of default. Among this latter category of optional defaults are the following: (1) failure to give advance notice of bankruptcy, (2) failure to maintain a specified minimum net worth established by GNMA, and (3) the actual filing of a petition in bankruptcy. Upon the occurrence of a default under the Guaranty Agreement, whether automatic or elective, GNMA is contractually entitled to issue a letter of extinguishment to the issuer. The effect of this letter is to terminate thereafter any rights that the issuer has retained in the pooled mortgages and to substitute GNMA for the debtor as the issuer of the certificates. Upon this occurrence, GNMA, as substituted issuer, is entitled to collect the receipts under the mortgages and becomes responsible for all future payments on the certificates.

The issuer's right to service the mortgages in the Debtor's GNMA pools and to collect the servicing fees allowed under the Guaranty Agreements is a valuable right, which can be sold to another servicer (approved by GNMA) for a substantial amount. The Debtor has stated in its Statement of Financial Affairs that its servicing portfolio has a value of $700,000.00. There is testimony that the value of the portfolio might actually approach $1,000,000.00.

The Debtor filed its voluntary petition under Chapter 11 of the new Bankruptcy Code on Friday, February 1, 1980. On

Monday, February 4, 1980 the Debtor notified GNMA of the filing by a telephone call to GNMA's offices in Washington, D.C. On February 6, 1980 the Debtor's president, Ramsey Agan, and the Debtor's attorney, Benjamin C. Abney, flew to Washington, D.C. to meet with GNMA. At that meeting GNMA made the determination that the Debtor was in default under the Guaranty Agreements with GNMA. GNMA's determination was based on a perceived change of business status of the Debtor that materially affected GNMA, the acknowledgment and confirmation of the Debtor's insolvency, the inability of the Debtor to meet GNMA's net worth requirements to act as issuer of securities under the Guaranty Agreements, and the fact that the Debtor had failed to give GNMA advance notice of an impending or actual default as required by section 5.03 of the Guaranty Agreements. Accordingly, at the end of the meeting on February 6, 1980, Mr. R. Frederick Taylor, Executive Vice-President of GNMA, delivered a letter, which GNMA contends terminated all of the Debtor's rights as issuer under the Guaranty Agreements, declaring Adana in default and advising the Debtor that GNMA was exercising its contractual rights to substitute itself for the Debtor as issuer under the Guaranty Agreements. GNMA then offered a substitute contract to the Debtor which among other things, (1) reduced the compensation the Debtor would receive for its servicing of the mortgages, (2) gave GNMA the right to terminate the substitute contract at any time without compensation to the Debtor's estate, (3) transferred control of all of the custodial bank accounts from the Debtor to GNMA, and (4) limited the term of the contract to one (1) year. The Debtor has never executed the proposed interim servicing agreement presented to it by GNMA.

In the early morning of March 3, 1980, GNMA sent one of its officers to each of the three line banks and, without any prior warning to the Debtor or the line banks or approval by the Bankruptcy Court, presented a written demand that the line banks turn over all funds in the Debtor's custodial accounts and all mortgages and other loan documents pertaining to GNMA pools and held by the line banks as custodians. Each custodial bank refused to comply with GNMA's demand without first obtaining direction from this Court.

The Debtor promptly filed a motion for contempt the same day alleging that the letter of February 6, 1980, attempting to terminate the Debtor's issuer status under the Guaranty Agreements, and the attempted seizure of the custodial bank accounts and mortgage documents violated the stay. At 10:50 A.M., that morning the hearing on that motion began before this Court, with attorneys representing the Debtor, GNMA and the three line banks present. After hearing, the court entered an order to preserve the status quo until a full hearing could be held on March 11, 1980.

R. Frederick Taylor signed the February 6, 1980 default letter that allegedly terminated GNMA's contract with the Debtor on the basis of the Debtor's financial condition. Mr. Taylor also ordered the March 3, 1980 demand letters to the three line banks to be delivered. William Linane, Warren Lasco, and Clement Dinsmore delivered the March 3, 1980 demand letters to the three line banks that held the Debtor's custodial accounts. Mr. Laurent is the GNMA officer who signed the March 3, 1980 demand letters.

It is undisputed that Adana has made all required payments to the certificate holders as and when due, and that the defaults cited in the purported letter of termination by GNMA were of the elective nature, i. e., GNMA was required to declare in writing the occurrences as events of default. GNMA officials stated that GNMA's actions were necessary in light of the uncertain financial situation of the Debtor and the absolute necessity of timely payments to the certificate holders. The purpose of the mortgage-backed securities program is to assure a flow of private investment capital into the housing market. Through its experience with the GNMA "straight passthrough" securities program, formerly the only GNMA securities program, GNMA

knows that timely, dependable monthly payments are vitally important to investors. According to GNMA, the straight pass-through certificates, which provide for payments to certificate holders only to the extent of receipts on the underlying mortgages, were a failure in the marketplace. On the other hand, the program of "modified pass-through" certificates of the type issued by the Debtor has been highly successful with investors. For this reason, GNMA officials feel that absolute timeliness of payments on these "modified" GNMA certificates is essential to the continued viability of its program, and indirectly to the housing industry of this nation. GNMA officials felt that the Debtor's failure to meet GNMA's net worth requirements threatened the Debtor's ability to make timely payments on its certificates and, consequently, elected to declare the Debtor in default under its Guaranty Agreements and to terminate its Issuer status under the Agreements, notwithstanding the filing of the Debtor's bankruptcy petition. GNMA officials also felt that the demands made upon the line banks were necessary corollaries to the termination of the Debtor's Issuer status.

## SUMMARY OF THE MORTGAGE–BACKED SECURITIES PROGRAM

The following chronological summary of the mortgage-backed securities program is necessary to the discussion of the issues involved in this case:

1. After an investigation of information about Adana's operations submitted to GNMA by Adana, GNMA grants the issuer authority to Adana.

2. Pursuant to the form Guaranty Agreement, GNMA issues a commitment to Adana for guaranty of securities, and assigns a pool number to Adana.

3. Adana makes loans to homeowners and receives mortgages, which are recorded in the name of Adana as Lender. Adana assembles numerous mortgages into a pool, pursuant to the commitment.

4. Adana makes arrangements with a securities dealer to market the mortgage-backed securities when they become available or may market the securities on its own behalf.

5. Adana makes arrangements for a custodian; e. g., a bank; to maintain possession of the mortgages and other documents; and for the holding of principal and interest and tax and insurance funds at such financial institution in a custodial account. Preliminary documentation is sent to GNMA by Adana and the custodian, including a schedule of mortgages certified by the custodian, custodial agreements for the mortgages and the escrow accounts and a schedule of subscribers, on which Adana sets forth the name of the purchaser(s) of the certificate(s) and the irrevocable instructions for delivery of the certificate(s).

6. When a pool is assembled, Adana submits the final documents to GNMA for final and prompt (within 2 calendar days) approval of the issuance.

7. Upon approval, GNMA instructs its transfer agent to prepare and deliver the certificates in accordance with instructions of the issuer.

8. Adana completes the sale of the certificates to the investors who become the "holders" of the certificates (securities).

9. Adana holds record title to the mortgages in the pool in its name.

10. The Guaranty Agreement between Adana and GNMA includes as assignment of the mortgages to GNMA by Adana.

11. The assignments of the mortgages are not recorded.

12. Under the Guaranty Agreement, Adana is responsible for servicing the mortgages, collecting the mortgage payments from the homeowners in that pool and passing on the payments monthly, by the 15th of the month, to the holders, as provided for in the certificates (securities).

13. Under said Agreement, Adana receives a servicing fee based upon a percentage of the unpaid principal balance of the mortgages in the pool.

14. Adana is required to make periodic reports to GNMA.

15. Adana, and its custodial bank, hold the monthly mortgage collections for prompt payment to the securities holders.

16. If a homeowner fails to pay promptly, or defaults altogether, under the Guaranty Agreement, Adana, nevertheless, is responsible to remit promptly the total amount due to the securities holders.

17. In the event of a failure of Adana to pay the securities holders timely, on the 15th of the month, GNMA is forthwith liable to pay, as guarantor, the amount due the securities holders. By statute the GNMA guaranty is backed by the full faith and credit of the United States.

18. Any failure of Adana to pay the securities holders fully and promptly on the 15th of the month is a cause of default in the issuer's Guaranty Agreement with GNMA.

## CONCLUSION OF LAW

I. Under Section 365 The Guaranty Agreements may not be Assumed by the Debtor and may be Terminated by the Government Pursuant to the Bankruptcy Code

■ The Guaranty Agreements[1] which the Government seeks to terminate are executory contracts because material performances remain due and owing by both parties to the Agreements. Section 365 of the Bankruptcy Code governs the rights of the parties to executory contracts after one of the parties becomes a debtor in a bankruptcy proceeding. Most executory contracts may either be assumed or rejected by a debtor in possession, but the debtor may not assume contracts which are nonassignable under the law governing the contract or which are contracts to make "financial accommodations". Section 365(c). Moreover, nonassignable contracts and contracts to make "financial accommodations" may be terminated upon insolvency, bankruptcy or other financial defaults, unlike other types

of executory contracts. Section 365(e)(2). The automatic stay of actions against the debtor set forth in Section 362 requires that a party to an executory contract prove the applicability of Section 365(e)(2) to the Court before taking action to terminate the contract. The appropriate procedure for obtaining Court approval of termination under Section 365(e)(2) is to seek relief from the automatic stay under the provisions of Section 362(d)(1), which require the Court to grant relief for "cause." GNMA has followed this procedure by filing this adversary proceeding.

A. The Guaranty Agreements are Nonassignable under Applicable Law

■ 1. *Law Governing the GNMA Program Forbids Assignment.* Section 365(c)(1) provides that a debtor may not assume an executory contract if the law governing the contract would excuse the other party to the contract from rendering performance to an assignee, even if the contract itself does not expressly prohibit assignment. The law governing the Guaranty Agreements is 12 U.S.C. § 1721(g), the enabling statute for the GNMA mortgage-backed securities program, and the regulations issued by GNMA pursuant to that statute. The statute itself is very brief, leaving most of the details of the program to be set forth in the regulations. Thus, while unfortunate in view of this litigation and the uncertainty which prevails as to the legal rights of the various parties' interests in the mortgages and securities, it is not surprising that Section 1721(g) does not deal with assignment, although it does expressly authorize GNMA to terminate the Guaranty Agreements immediately upon default. The applicable regulations are set forth in 24 C.F.R. § 390.1 et seq. and in the GNMA Mortgage-Backed Securities Guide (hereinafter referred to as the "Guide") which is incorporated by reference into and made a part of the applicable regulations. *See* 24 C.F.R. 390.1.

---

1. A separate Guaranty Agreement is executed by Adana and GNMA for each pool of mortgages upon which mortgage-backed securities are issued. The GNMA guaranty flows to each security certificate holder. Some forty (40) such pools and Guaranty Agreements have been issued by Adana.

The Guide provides unequivocally that the Guaranty Agreements may not be assigned *without the consent* of GNMA. Chapter 2, page 2–2 provides with respect to the servicing and administrative functions to be performed by the Issuer under the Guaranty Agreement:

"The issuer may not delegate or transfer to others (through a power of attorney or otherwise) its obligations to perform the functions of: (a) making monthly payments to securities holders or withdrawing funds from the P & I [principal and interest] custodial account for any other purposes; (b) submitting required monthly reports to GNMA; (c) making the payments of the guaranty fee to GNMA; (d) withdrawing mortgage documents from the document custodian; and (e) maintaining the Register of Certificate Holders. These functions must be carried out by the issuer."

Under these regulations GNMA would be excused from accepting performance *from an assignee* under the Guaranty Agreement. An attempted assignment of the Guaranty Agreement *without GNMA's consent* would be a default entitling GNMA to terminate the Guaranty Agreement. Since the regulations governing the mortgage-backed securities program constitute the law applicable to the Guaranty Agreements, and since the Agreements are not assignable under those regulations, Section 365(c)(1) of the Bankruptcy Code prohibits this Chapter 11 debtor in possession from assuming the Guaranty Agreements, without the consent of GNMA.

2. *General Law Applicable to Federal Contracts Forbids Assignment.* Even if the law specifically governing the mortgage-backed securities program did not forbid assignment, the Guaranty Agreements would come within the scope of the Nonassignment Act, codified at 41 U.S.C. § 15.

Pursuant to the Nonassignment Act, no U. S. government contract is assignable, and any purported assignment of a government contract shall cause the annulment of the contract at the option of the government. The purpose of this Act is "to secure to the United States the personal attention and services of the contractor," *e. g., Francis v. United States,* 11 Ct.Cl. 638, *affirmed* 96 U.S. 354, 24 L.Ed. 663 (1875), and to assure that the government "might also know with whom it was dealing until the contract was completed and settlement made." *E. g., Hobbs v. McLean,* 117 U.S. 567, 6 S.Ct. 870, 29 L.Ed. 940 (1886); *Thompson v. Commissioner of I. R. S.,* 205 F.2d 73 (3rd Cir. 1953).[2] GNMA is both entitled to and in need of the protection intended by the Nonassignment Act when it entered into the Guaranty Agreements under consideration in this case. GNMA relies upon the integrity, capability and financial and managerial stability of the issuers chosen for the mortgage-backed securities program. GNMA issuers are routinely required to receive, deposit, withdraw and account for millions of dollars of residential mortgage payments and to maintain trust accounts for these payments and for the payment of millions of dollars in ad valorem taxes and homeowner's insurance premiums. Careful initial scrutiny of potential issuers and detailed periodic reporting by accepted issuers are part of the GNMA program not only because the full faith and credit of the United States is at stake, but also because the hard-earned monies of individual homeowners is at stake in the trust accounts, and all of this rests largely on the integrity and management capability of the issuers. Thus it is clear that, if an issuer attempted to assign a Guaranty Agreement without GNMA's consent, GNMA would be entitled to terminate the Agreement pursuant to

**2.** Although the prohibition against assignment of government contracts in 41 U.S.C. § 15 has not been interpreted by the courts to be as absolute as the statutory language would indicate, the key to the assignability of such contracts is whether the assignment of the contract is "within the mischief Congress intended to prevent." *Thompson, supra,* at 76. If the

contract is of the sort where the government depends upon certain characteristics or abilities of the contractor, then the prohibition of 41 U.S.C. § 15 will apply. *See, id.* at 77. As demonstrated in text, GNMA clearly relies on the integrity, efficiency and management capabilities of the issuers approved under the GNMA programs.

the Nonassignment Act, 41 U.S.C. § 15. Section 365(e)(1) of the Bankruptcy Code recognizes this statutory right to refuse performance from an assignee and prevents the debtor from assuming the Guaranty Agreements without the consent of GNMA; and Section 365(e)(2) also gives GNMA the right to terminate the Guaranty Agreements.

■ 3. *GNMA Does Not Consent to Assumption of the Guaranty Agreements.* The debtor has stated in its brief in opposition to GNMA's complaint that GNMA has consented to the assumption of the Guaranty Agreements by virtue of the default letter dated February 6, 1980 from GNMA to the debtor. This is an unwarranted claim based on the statement in that letter that "each Guaranty Agreement remains in effect."

First, a statement that an agreement remains in effect at a certain date is not a statement that GNMA consents to the assumption of the agreement by the debtor. To the contrary, the primary purpose of the February 6, 1980 letter was to terminate all of the debtor's rights under the Guaranty Agreement. The letter specifically states: "In consequence of the corporation's defaults, Adana may no longer act as *Issuer* under the guaranty agreements." [Emphasis added] The status of "Issuer",[3] which is a defined term under the Guaranty Agreements, entitles the debtor to receive monies paid on the mortgages backing the debtor's securities, to hold these monies in escrow accounts, to pay the monies monthly to the holders of the debtor's securities, to collect certain fees, to maintain the register of securities, to withdraw the mortgages backing the securities from the possession of custodians for certain purposes, and in general, to take all actions necessary to service the mortgages backing the securities and to administer the securities themselves. Thus, by advising the debtor that its "Issuer" status was terminated, GNMA manifested its intention to terminate all rights and privileges of the debtor, as *"Issuer"*, under the Guaranty Agreements. Nevertheless, the exigencies of the GNMA mortgage-backed securities program, arising from the absolute necessity of prompt monthly payments to securities holders, require GNMA to continue, at least temporarily, to make use of an Issuer to service pooled mortgages, even after the Issuer has defaulted. This need is anticipated by the Guaranty Agreement, Sections 8.04 and 8.06, which require the Issuer to continue to act in a servicing capacity at the request of GNMA, even after the Issuer has defaulted and the Issuer status has been terminated by GNMA. GNMA sought to exercise its contractual rights to require the debtor to continue servicing the mortgages after default by stating in the February 6, letter;

> "GNMA instructs Adana to continue servicing the mortgage pools listed in the attached exhibit under an interim moratorium agreement . . .
>
> . . . For so long as the interim moratorium agreement is in effect Adana will act as a contract servicer . . . . ."

GNMA insisted on maintaining the Guaranty Agreements in existence for the purpose of exercising its rights thereunder, including the right to require the Issuer to continue servicing on an interim basis. In other words, the Government was contractually entitled to require the debtor to continue to service the mortgages after default, and sought to enforce that right.[4] The debtor

---

**3.** The term "Issuer" as used in the Agreement is perhaps an unfortunate, certainly imprecise, term in that it has more than one meaning. As a noun, it is the title of the mortgage lender, here Adana and all of Adana's duties, and, as a verb it means the function of issuing the mortgages and securities and includes the servicing role of the program. Likewise, the term "Guaranty Agreement" is misleading in that it encompasses the issuing of the mortgages and securities and the GNMA guaranty as well as the servicing of the program after issuance of the guaranty.

**4.** Thus, the Agreement is structured in parts, one part being the issuing and guaranty aspects, another part being the continuing servicing aspects of the mortgage pools. The latter

chose to comply with the request to service the accounts, although it could have refused and could have sought approval of the Court to reject the Agreements. Consent to assumption of an executory contract must clearly be based on the intent of the party consenting. There is no way to construe a letter intended to terminate the Issuer status of the debtor as a consent to an assumption of the Guaranty Agreements by the debtor, and GNMA has indicated its lack of consent irrefutably by this adversary proceeding seeking relief from the stay to terminate the Agreements.

Second, the Guaranty Agreements had to remain in effect as to the third party holders of securities previously issued under the Guaranty Agreements, because they contain the governmental guaranties extending to those securities.[5] Therefore, the statement in the February 6, 1980 letter on which the debtor relies merely confirmed the continuing nature of the Guaranty Agreements, and is in no way inconsistent with GNMA's attempt in the same letter to remove the debtor as "Issuer" under those Agreements.

GNMA did not consent to the assumption of the Guaranty Agreements by debtor by virtue of the February 6, 1980 letter of termination.

### B. The Guaranty Agreements are Executory Contracts to Make Financial Accommodations

■ Section 365(c)(2) provides that a debtor in possession may not assume an executory contract under which the other party has agreed to make financial accommodations to the debtor, or to issue the securities of the debtor. Although con-

tracts to extend credit and other such financial accommodations are generally considered to be personal in nature and, hence, nonassignable, Congress chose specifically to prohibit the assumption of all contracts to make financial accommodations, notwithstanding the prohibition against the assumption of all nonassignable contracts. Section 365(c)(2); 124 Cong.Rec. H11,093 (daily ed. Sept. 28, 1978). Therefore, the prohibition against assuming contracts to make financial accommodations applies whether or not applicable law would allow such contracts to be assigned. Section 365(c)(2). *See* 2 *Collier on Bankruptcy*, ¶ 365.05[1] at p. 365–34.

■ The term "financial accommodations" as used in Section 365(e)(2)(B) is not defined by the Bankruptcy Code or made clear by legislative comments. But, even giving this term the narrowest possible reasonable meaning, that is the extension of money or credit to accommodate another, the Guaranty Agreements are clearly contracts to make "financial accommodations, to or for the benefit of the debtor". First, GNMA is financially responsible for the continued payment of the debtor's obligations. If the debtor fails to make payments to GNMA certificate holders timely by the 20th of each month, GNMA must pay. Second, the issuance of the GNMA guaranty enables the issuer to obtain credit from the purchasers of the securities. Third, the Guaranty Agreement itself enables the issuer to maintain its GNMA mortgage business. Without the governmental guaranty, the former mortgage-backed securities program was not as successful. Thus, Congress enacted authority to GNMA to institute the government guaranty program. The current GNMA mortgage backed secu-

---

is a condition and function and fee income relationship and property right of the debtor. But all aspects of the agreement are interlaced and connected and related each to the other conditions.

5. Those guarantys, once issued to the securities, continue through the time of full satisfaction of payment. There is nothing further for

debtor or GNMA to do with respect to the granting and issuing of the guaranty, nor anything which can be done to withdraw or alter the guaranty of the United States through GNMA to make good on the terms of the guaranty. As to the security holders, the guaranty provision is fixed and vested.

rities program, with GNMA guaranty, which has issued over 100 billion dollars of government guaranteed mortgage securities from its inception in February 1970 to date, has enabled numerous mortgage lenders, such as debtor, admittedly "thinly capitalized," to become mortgage lenders in the GNMA program.

■ The debtor contends that the Guaranty Agreements do not constitute contracts to make financial accommodations to or for the benefit of debtor. To the contrary, the facts show that the Guaranty Agreements are contracts to make financial accommodations to or for the benefit of debtor. First, the debtor asserts that the securities constitute a type of liability of the debtor. Second, GNMA is obligated to pay the securities holders if the debtor fails to do so. In other words, GNMA is required by the Guaranty Agreements to make payments promptly on liabilities of the debtor, should the debtor fail to make them. The obligation to pay money on the obligation of another is a financial accommodation.

The debtor argues that because the securities are exculpated as to liability of the debtor, and the guaranty, once issued to the security holders, has no further connection to the debtor, it has "nothing" to lose from defaulting on its debts. To the contrary, the guaranty continues as a financial protection and credit advantage to the debtor, i. e., a default by the debtor on making the monthly payments timely and fully to the security holders can result in the loss of the debtor's right to service GNMA mortgage pools and GNMA securities. If these servicing rights ᵥconstitute "nothing" to the debtor, one must wonder why the debtor is opposing GNMA's request for relief in this adversary proceeding. Moreover, although the securities themselves are exculpated with respect to the debtor, the debtor is

obligated nevertheless to reimburse GNMA for any defaults on the certificates occurring while the debtor retains Issuer status.[6]

The debtor has also admitted that the GNMA guaranty is necessary to the marketing of its securities and, hence, to obtaining credit from the purchasers of its securities. Pursuant to the Guaranty Agreements, GNMA extends its credit, that is its promise to pay, to enable the debtor to issue securities backed by certain mortgages. Without this financial accommodation it is undisputed that the securities could not be sold by the debtor or subsequently resold by the holders. This type of situation seems precisely to be the type that Congress intended to deal with when it enacted Section 365(c)(2) to protect parties who have contracted with entities who have filed for relief under the Bankruptcy Code. Under no circumstances should a Chapter 11 debtor be permitted to assume an executory agreement, or obtain a court order in an adversary proceeding, which requires the United States government through GNMA to continue to extend financial accommodations which enhance the marketability of securities issued by the debtor, and correspondingly enhance the credit of the debtor in the market place.

The Guaranty Agreements are executory contracts to make financial accommodations for the benefit of the debtor, and therefore the debtor is prohibited from assuming them without GNMA's consent. GNMA does not consent.

II. The Right to Terminate an Executory Contract Pursuant to Section 365 is "Cause" Under Section 362(d)(1), for Relief from the Automatic Stay

■ Section 362(a) of the Bankruptcy Code establishes an automatic stay of all actions against a debtor or the property of the estate except those actions set forth in

---

6. *Guaranty Agreement*, Article II, Section 2.05 (obligating the debtor to make payments from its own funds to pay certificate holders) and *id.*, Article I, Section 1.03 (providing that the Guaranty Agreement shall remain in effect until GNMA has recovered all amounts "owed to it" under the Agreement).

Section 362(b). While the universal automatic stay is absolutely necessary for debtors and creditors to establish an immediate status quo, to prevent continuation of pending creditor actions, to prevent seizure of property from the estate, and to establish a calm within the storm, this stay can be unduly burdensome to creditors and parties in interest. Consequently, Congress set forth certain conditions which, when present, require the Court, upon proper application (that is, by way of an adversary proceeding complaint under Part VII of the Bankruptcy Rules), to grant relief from the automatic stay. Section 362(d)(1) states that, after notice and a hearing the Court "*shall*" grant relief from the stay "for cause". The purpose of the stay is to protect the debtor from harassment, bother and contact for a reasonable period of time and to prevent creditors from engaging in a "race of diligence" which could enable a creditor to obtain more than its equitable share of the debtor's estate. *See* H.Rep.No. 95–595, 95th Cong., 1st Sess. 340–2 (1977); S.Rep.No.95–989, 95th Cong., 2d Sess. 49–51 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. Where the plaintiff carries its burden of proving that the automatic stay is not necessary for the protection of the debtor or to prevent unfair advantage by a creditor, "cause" for relief from stay has been shown.

▉ As outlined above, the debtor in possession is prohibited from assuming or assigning the obligations of the Guaranty Agreements by the provisions of Section 365(c) and hence there is no contractual or legal reason to prevent GNMA from terminating the Guaranty Agreements. Termination is the inevitable final disposition of these Agreements as allowed under Section 365(e)(2), unless GNMA consents to their assumption or assignment by the debtor in possession. Because GNMA does not consent, the Guaranty Agreements and the benefits to be derived therefrom will not be available to the debtor in possession for use in any reorganization plan. Moreover,

GNMA will not be obtaining any unfair legal advantage by being allowed to terminate the Agreements now, because ultimately the Agreements must be allowed under Section 365. Thus, none of the purposes of the automatic stay are served by its continued application to prevent the termination of the Guaranty Agreements by GNMA. Hence "cause" for relief from the stay has been shown under Section 362(d)(1); and GNMA is entitled to relief from the automatic stay as a matter of law, effective this date. While relief from the automatic stay may be required under the applicable law here, the relief shall be in the form of termination, annulment, modification or conditioning such stay. The extent of the relief to which the Plaintiff is entitled under Section 362(d)(1) is determined by the application of equitable principals. 28 U.S.C. § 1481.

The court is aware that one of the rights inherent in "Issuer" status under the Guaranty Agreements is the right to collect fees for the servicing and administration of the pool of mortgages backing the Issuer's securities. When GNMA consents to the assignment of the Issuer's rights under the Guaranty Agreements, the rights, often referred to as the Issuer's portfolio, can be sold for substantial sums of money. For example, the debtor has listed the value of its portfolio at $700,000 in its Statement of Financial Affairs for Debtor Engaged in Business in this case. Some testimony placed the value at perhaps $1,000,000. Nevertheless, the realization by the Issuer of the market value of the servicing portfolio is dependent upon the consent of GNMA to an assignment by the Issuer and GNMA's approval of the Issuer's transferee. Pursuant to equitable principles under the Bankruptcy Code, such consent to a debtor in possession should not be withheld unreasonably by a party to an agreement under which a debtor has such a right to property. GNMA is entitled to relief from the automatic stay, for the reasons stated above, but a termination of the stay would, potentially, have allowed a valuable asset of the debtor to be

removed from the estate without replacement of the value of that asset. Even though the servicing portfolio cannot be transferred by the Issuer without the consent of GNMA, and even though GNMA has the right under certain circumstances to terminate the Issuer's right to service the mortgages, the value of the servicing portfolio is largely the result of the efforts of the Issuer and, for this reason, in a non-bankruptcy situation GNMA has generally permitted a servicing portfolio to be sold and the net proceeds to inure to the benefit of the Issuer. If GNMA were allowed to terminate the Issuer's servicing rights without any obligation to replace the value of that removed asset, not only would the Issuer be deprived of the fruits of its labor, but a clear "windfall" corresponding to the Issuer's loss would be conferred upon either GNMA (if it retained the portfolio or sold it and retained the proceeds) or a transferee of the portfolio (if GNMA transferred the portfolio without consideration). When GNMA's right to remove the servicing portfolio occurs in a bankruptcy context, such obvious inequity should not and need not result. The equitable powers of the Bankruptcy Court under 28 U.S.C. § 1481 and Section 362(d)(1) to modify or condition the automatic stay in accordance with the equities, and under Section 105(a) of the Bankruptcy Code furnish ample authority to issue any order necessary or appropriate to carry out the provisions of Title 11 U.S.C. Thus, any order granting relief from the automatic stay to GNMA for the purpose of terminating GNMA Guaranty Agreements could be conditioned upon a commercially reasonable transfer of the servicing portfolio to a transferee approved by GNMA, with the net proceeds of such a transfer to become part of the bankruptcy estate. But for the stipulation in this case preserving the value of the debtor's servicing portfolio for the estate, the Court would have found it necessary to apply these equitable powers.

In the present case, GNMA and the debtor have stipulated and the court has entered an order that, in the event GNMA is granted relief from the stay, the servicing portfolio will be sold in a commercially reasonable manner and the net proceeds of that transfer (gross proceeds less Court approved costs and expenses of transfer) will be placed in the estate.[7] WHEREFORE, the request of GNMA for relief from the automatic stay for purposes of terminating the Guaranty Agreements between GNMA and the debtor is hereby granted. Pursuant to the Order of this Court dated May 1, 1980, the debtor's servicing portfolio shall be sold in a commercially reasonable manner and the proceeds of such disposition shall be returned to the estate, after deducting the reasonable costs of the disposition approved by this Court.

The effective date of this opinion and the attached judgment, pursuant to Bankruptcy Rule 921, shall be the date of filing of the amendment to the complaint to substitute GNMA as plaintiff in lieu of United States of America as required by Order of this Court dated August 13, 1980. Upon the filing of such substitution of GNMA as plaintiff, the attached judgment shall be entered.

---

7. On May 1, 1980 this Court entered an order consented to by the Debtor and line banks and unopposed by GNMA after due notice, which provides that, in the event GNMA is successful in removing the servicing portfolio from the Debtor's estate, the portfolio will be sold in a commercially reasonable manner, with the proceeds of such a sale to be placed in the estate.