**In re WEGNER FARMS COMPANY, Debtor.**

**WEGNER FARMS COMPANY, Plaintiff,**

v.

**MERCHANTS BONDING COMPANY and John Bednarz, Defendants.**

Bankruptcy No. 85–00038W.
Adv. No. 85–0080W.

United States Bankruptcy Court,
N.D. Iowa.

May 1, 1985.

Eric W. Lam of Moyer & Bergman, Cedar Rapids, Iowa, for plaintiff/debtor.

Michele A. Druker of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, Iowa, for defendants.

## MEMORANDUM OF DECISION

*Pursuant to Order of April 5, 1985*

WILLIAM W. THINNES, Bankruptcy Judge.

On March 29, 1985, hearing was held on a Complaint for Temporary Restraining Order, For Citation of Contempt and For Other Relief filed by Debtor in response to the cancellation of its grain dealer's bond by Defendants Merchants Bonding Company (Merchants) and its assistant vice-president John Bednarz.[1] Attorney Michele A. Druker appeared for Defendants and Attorney Eric W. Lam represented the Debtor. At the close of the hearing, the Court ruled from the bench that the bond constituted property of the estate; thus Defendants' unilateral cancellation of the bond postpetition violated the automatic stay. The Court further ordered that Defendants were enjoined from cancelling the bond since termination of coverage would cause irreparable harm to the Debtor. The Court's oral ruling was memorialized in an order dated April 5, 1985. The following Memorandum of Decision is intended to provide the basis for that Order.

## FINDINGS OF FACT

1. On January 8, 1985, Wegner Farms Company, an Iowa corporation, filed a voluntary Chapter 11 Petition. At the time of filing, Debtor was duly licensed as a grain dealer by the State of Iowa. In order to meet the licensing requirements of Iowa Code, Chapter 542, Debtor obtained a bond from Merchants in the penal sum of $25,000 for the benefit of all persons buying grain from or selling grain to Wegner Farms. The bond was issued on November 15, 1979, and as required by Iowa Code section 542.2, was to remain in continuous force until cancelled by the surety. Because Debtor upgraded its grain dealer's license from a Class II to a Class I license in July of 1982, the bond was amended by a rider increasing the penal sum to $50,000. *See* Iowa Code § 542.2.

2. From the evidence adduced at the hearing, it appears that although the law requires a continuous bond, premiums are paid on an annual basis with the next premium due in November of 1985. No evidence was presented that Debtor was in arrears on its premium payments.

3. The bond provides that it "may be terminated by the surety by sending a written notice of termination by certified mail to the Principal and to the Director of the Warehouse Division of the Iowa State Commerce Commission, Des Moines, Iowa, at least 60 days prior to the effective date of such termination."

4. On January 15, 1985, Merchants sent a Notice of Termination by certified mail to Wallace Dick, Director of the Warehouse Division. Mr. Dick then notified the Debtor by a letter dated January 18, 1985, that the bond would be cancelled effective March 17, 1985 and that Wegner Farms grain dealer's license would be revoked by operation of law unless notice of a replacement bond was received in the Commission's office before that date.

5. At the time Merchants initiated cancellation procedures, it was aware of Debtor's bankruptcy. Specifically, defendant Bednarz testified that when he received Debtor's financial statement in December showing a substantial loss for 1984, he requested a personal financial statement from Ralph and Bernice Wegner since Merchants had a right of indemnification from them personally. On January 15th the Wegners' insurance agent informed Bednarz that both the Wegners and Wegner Farms had filed bankruptcy and thus no personal financial statement would be forthcoming. Bednarz admitted that the unavailability of a personal financial statement and the filing of bankruptcy were the primary factors in Merchants' decision to

---

1. The Court on March 20, 1985, after notice and hearing, entered a Temporary Restraining Order requiring Merchants to reinstate the bond and cease from any further cancellation efforts. Merchants promptly complied with that Order and the bond was in full force and effect at the time of the March 29th hearing.

immediately initiate cancellation procedures.

6. Ralph Wegner, president and director of Wegner Farms, testified that the revenues received from Debtor's grain dealing operation constituted approximately $96,000 while the total revenues from the farming operation were $250,000. He further stated that without income from the operation, Debtor's Chapter 11 proceedings might have to be converted to a Chapter 7 liquidation.

## DISCUSSION

The sole question presented by this factual scenario is whether Merchants' unilateral termination of the bond postpetition violated the automatic stay.

The filing of a bankruptcy petition "operates as a stay applicable to all entities of," among other things,

(1) The commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against a debtor that arose before the commencement of the case under this title;

\* \* \* \* \* \*

(3) Any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

11 U.S.C. § 362(a).

In an attempt to avoid the effect of section 362, Merchants advances two theories to justify its unilateral termination of the bond shortly after the commencement of the Debtor's Chapter 11 proceedings. First, Merchants contends the bond was not property of the estate; thus termination of the bond was not stayed by Debtor's bankruptcy. Even assuming the bond constituted property of the estate, Merchants argues the bond was a financial accommodation of the kind contemplated by 11 U.S.C. § 365(e) which permitted Merchants to unilaterally cancel the bond without seeking relief from the automatic stay.

■ Contrary to Merchants' assertions that cancellation of the bond was not stayed by Debtor's bankruptcy, the Court concludes termination of bond was prohibited by section 362. In particular, Merchants' efforts to cancel the bond constituted a "proceeding" against the Debtor within the meaning of section 362(a)(1). *See, e.g., In re Advent Corp.,* 24 B.R. 612, 614 (Bkrtcy.App. 1st Cir.1982) and *In re R.O. A.M., Inc.,* 15 B.R. 616, 617 (Bkrtcy.Nev. 1981), (where both courts held a cancellation of a surety bond postpetition was proceeding against the debtor which violated the automatic stay).

As noted in the legislative history the scope of this paragraph is very broad and encompasses all proceedings even those not before governmental tribunals. S.Rep. No. 95–989, 95th Cong. 2nd Sess. (1978) 51; H.Rep. No. 95–595, 95th Cong. 1st Sess. (1977) 5 U.S.Code & Admin.News (1978) pp. 5787, 5837, 6297. Pursuant to Iowa Code Section 542.4, Merchants could not legally cancel the bond without giving 60 days' notice by certified mail to the Iowa State Commerce Commission and the Debtor. Although this procedure was informal and not judicial in nature, it nonetheless was a proceeding by Merchants to forfeit Debtor out of a valid extant contract. As such, the procedures initiated by Merchants to terminate Debtor's interest in the contract was a proceeding against Debtor in contravention of section 362(a)(1).

■ The Court also concludes Merchants' cancellation of the bond violated section 362(a)(3) which prohibits "any act to obtain possession of property of the estate ... or exercise control over property of the estate."

■ The filing of a bankruptcy petition creates an estate comprised of "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). As with the automatic stay provisions,

the scope of this section is broad ... and includes all kinds of property, including tangible and intangible property, causes of action ... and all other forms of property currently specified in section 70(a) of the Bankruptcy Act. The debtor's interest in property also includes 'title' to property, which is an interest, just as are a possessory interest, or a leasehold interest, for example.

House Rep. No. 95–595, 9th Cong. 1st Sess. (1977) 367; Senate Rep. No. 95–989, 95th Cong.2d Sess. (1978) 82, U.S.Code Cong. & Admin.News 1978 pp. 5868, 6323. What constitutes a legal or equitable interest of the debtor in property is broadly construed. *In re Lichstrahl,* 750 F.2d 1488, 12 B.C.D. 1020 (11th Cir.1985).

Notwithstanding this fact, Merchants contends Debtor had no legal or equitable interest in the bonding agreement. In support of this proposition, it relies on several cases in which courts have held that a surety bond did not constitute property of the estate. *In re Apache Construction, Inc.,* 34 B.R. 415, 417 (Bkrtcy.Or.1983); *In re Jay Forni, Inc.,* 33 B.R. 538 (Bkrtcy.N. D.Cal.1983); *In re Fintel,* 10 B.R. 50, 51 (Bkrtcy.Or.1981); *In re Buna Painting & Dry Wall Co.,* 503 F.2d 618, 619 (9th Cir. 1974).

In the *Apache, Forni* and *Fintel* decisions, the courts were faced with situations in which the intended beneficiaries of surety bonds were making claims for payment under the bond. All three courts held such actions were not barred by the automatic stay since the surety bond was not property of the estate. In *Buna,* a Bankruptcy Act case, the Court of Appeals held the trustee in bankruptcy could not compel payment of the penal sums of surety bonds into the estate because the bonds were not property of the estate.

To the extent these cases can be read as merely holding that a Debtor has no interest in the penal sums intended for the benefit of the third party claimants, this Court passes no judgment on these decisions.[2] To the extent, however, these decisions can be construed as holding that debtor as a contracting party to the bonding agreement has no legal or equitable interest in the contract, this Court concludes these decisions are incorrect as a matter of law. The bonding agreement was a valid legal contract entered into by Merchants and Debtor. Even though the payment obligation ran to the third parties doing business with Debtor as a grain dealer, Debtor's coverage under the bond was a contractual obligation bargained for by the Debtor and for which it paid valuable consideration. It defies logic to say that Debtor as the named principal under bond and the payer of the premium for the coverage provided by the bond had no legal or equitable interest in the bonding agreement. Quite the contrary, the Debtor had valid contractual rights in the bonding agreement on the date of filing. Contractual rights constitute intangible property which is included within the definition of property of the estate. Consequently Merchants' unilateral termination of the agreement postpetition was an attempt to obtain possession of property of estate in contravention of section 362(a)(3).

Merchants next argues that even if the bonding agreement is property of the estate, it is a financial accommodation of the kind described in section 365(e)(2) which would permit Merchants to cancel its contractual obligation without seeking relief from the automatic stay. Under section 365(e)(2)(B) an executory contract "to make a loan or extend other debt financing or financial accommodations, to or for the benefit of the debtor" is excepted from the general rule which prohibits cancellation or termination of contracts because of insolvency or the filing of bankruptcy. This particular species of executory contracts may not be assumed or assigned by a debtor. 11 U.S.C. § 365(c).

---

**2.** Even in these circumstances, it could be argued that Debtor had a legal or equitable interest in payments made pursuant to the bonding agreement because these funds are satisfying claims against the estate and will ultimately result in a claim against the estate by the surety.

In its ruling from the bench, the Court rejected Merchants section 365 argument. After reviewing the existing case law and other authorities, the Court concludes its initial ruling was in error insofar as it held that the bond was not a financial accommodation for the benefit of the debtor. The term financial accommodation is not defined by the Code or made clear by the legislative comments. Indeed, legislative statements accompanying section 365(c)(2) seem to limit the thrust of this section to contracts to make loans or other traditional kinds of debt financing arrangements. "The purpose of this section is to make clear that a party to a transaction which is based upon the financial strength of a debtor should not be required to extend new credit to the debtor in the form of loans, lease financing or the purchase of discount notes."[3] S.Rep. No. 95–989, 95th Cong. 2nd Sess. (1978) 58–59 5 U.S.Code & Admin.News (1978) p. 5844–45.

Certainly a surety bond does not fit neatly within the framework of traditional debt financing. Nonetheless, as noted by the court in *In re Adana Mortgage Bankers Inc.*, 12 B.R. 977, 987 (Bkrtcy.N.D.Ga.1980) (*Adana I*), even giving the term financial accommodation a narrow construction, "[t]he obligation to pay money on the obligation of another is a financial accommodation" within the meaning of section 365(c) and (e). In *Adana I*, the court held Guaranty Agreements entered into by the debtor, a mortgage banker, and the Government National Mortgage Association (GNMA) were financial accommodations because they obligated GNMA to make payment on mortgaged-backed securities issued by the debtor in the event debtor did not pay.

Of course, the *Adana I* Guaranty Agreements are distinguishable from the bond at bar in that they allowed the debtor to obtain credit in the secondary mortgage market by issuing securities guaranteed by the government. Strictly speaking, the surety bond does not allow the debtor to obtain credit in its grain dealing operations. However, it does obligate Merchants to make good on certain financial liabilities of the debtor in the event debtor does not or cannot pay. Moreover, the issuance of a bond is intimately connected to debtor's financial integrity as evidenced by the requirement that Debtor furnish financial statements to Merchants and Merchants alarm over Debtor's recent losses. Given these characteristics, the Court concludes the bond is a financial accommodation within the meaning of section 365(c) and (e). As such it cannot be assumed by debtor and can be terminated by Merchants because of Debtor's bankruptcy.

Having accepted Merchants 365(e) argument, the Court must nonetheless reject its contention that right of termination necessarily propels cancellation of the bonding agreement outside the orbit of the automatic stay. The only authority Merchants cites in support of this proposition is 2 *Collier on Bankruptcy* ¶ 365.05[1] (15th ed. 1985) where it is stated: "Presumably the automatic stay of section 362, which prohibits a creditor from terminating or accelerating after the petition, will not apply to these special kinds of contracts or leases." The Court concludes this exposition on the interplay between section 362 and 365 is incorrect for several reasons.

In the first place, although Congress deemed it necessary to exempt certain actions from the automatic stay, none of the limited exceptions provided for in 362(b) can be read as embracing Merchants' unilateral termination. Elsewhere in the Code, Congress overrode the provisions of automatic stay when it felt such action was necessary to protect a party's right in a particular species of property. *See* 11 U.S.C. § 1110 (where Congress nullified the provisions of the automatic stay and the power of the court to enjoin a creditor from taking of possession aircraft equipment or vessels unless debtor complies

---

**3.** Since section 365(c)(2) is derived from section 365(b)(4) of the Senate amendment, the court has only quoted from the report accompanying the Senate Bill. *See* Legislative Statements, 11 U.S.C. § 365, Bankruptcy Code (West 1984) p. 92.

with certain conditions within 60 days after a case is commenced). Because Congress knew how to except certain actions from the automatic stay or conditionally override its effect as to certain property, the Court concludes Congress did not intend to except this brand of executory contracts from the reach of the automatic stay. *See In re Adana Mortgage Bankers, Inc.,* 12 B.R. 989 (Bkrtcy.Ga.1980) (*Adana II*) (where the court, in a companion case to *Adana I,* rejected GNMA's argument that its right to terminate debtor's Guaranty Agreements relieved it from the provisions of the automatic stay and held GNMA in contempt for unilaterally terminating the agreements postpetition). Finally, not exempting this brand of executory contracts is consistent with the purposes and policies underlying the staying of actions against a debtor postpetition.

As noted by the court when faced with similar contentions by GNMA in an attempt to justify its unilateral postpetition cancellation of Debtor's Guaranty Agreement:

> One of the fundamental protections offered a debtor in a case under the Bankruptcy Code is the automatic stay of actions against him provided in Section 362 of the Code. The stay operates to prevent a race of diligence by creditors intent on a piecemeal dismemberment of the Debtor's assets. The stay insures that all of the property of the Debtor will be brought into the custody of the "bankruptcy court by the filing of the petition, and no interference with that custody can be countenanced without the court's permission." Without such a provision the orderly liquidation or rehabilitation of the Debtor would be impossible.

*Adana II,* 12 B.R. 989, 997 (Bkrtcy.N.D.Ga. 1980). (Citation to footnotes and text of footnotes omitted).

Sections 365(e) and (c) are intended to be limited and closely circumscribed exceptions to the general rule permitting a debt-

or to assume executory contracts and prohibiting nondebtor parties from terminating such contracts upon the filing of bankruptcy. Therefore, bringing these kinds of contracts within the ambit of the automatic stay ensures that the legal question of whether a particular contract may be terminated will be decided in the proper forum, after a full briefing by the parties, rather than by a nondebtor party acting unilaterally and perhaps erroneously. Were it otherwise, contracts not within the contemplation of this limited exception could be terminated unilaterally with great harm to the bankruptcy estate. It also signals a debtor seeking to reorganize that other arrangements may be necessary if a particular contract is fundamental to and necessary for his reorganization efforts. In the event the particular contract is vital, a request for relief from the stay may spur a debtor to make accommodations that will be satisfactory to the nondebtor party and allow the contract to continue in effect uninterrupted. For example, if Merchants had properly sought relief from the stay, debtor may have provided them with additional financial information which would have alleviated Merchants' concern or pledged assets to secure any payments for which Merchants may ultimately have been liable for pursuant to the bonding agreement. Additionally, since a request for relief from the stay is decided by resort to equitable principles, the court is given an opportunity to fashion the relief in a manner that will be equitable to both parties and protect other important rights of a debtor that might otherwise be lost by a unilateral termination.[4] *See, e.g., Adana I,* 12 B.R. 977, 988 (Brktcy.N.D.Ga.1980) (where, although the court held GNMA was entitled to relief from the stay to terminate the Guaranty Agreements, that relief was conditional on GNMA agreeing to a commercially reasonable transfer of debtor's servicing portfolio to a suitable trans-

---

**4.** In the case at bar, Debtor contends that, at least until the next premium becomes due, the bond is not an executory contract. The resolution of this issue depends on whether material performances remain due and owing by both parties, a matter that can be fully explored, when and if, Merchants properly seeks relief from the stay.

feree with net proceeds of the transfer to become part of the bankruptcy estate).

Finally, requiring a party to first seek relief from the stay before exercising its potential termination rights enhances judicial economy by avoiding the need for emergency hearings and temporary restraining orders.

In sum, preserving the status quo pending a request for relief from the automatic stay by a contracting party and a ruling by the court that relief should be granted is not only dictated by the Code but also serves important policy concerns.

Having concluded that Merchants must seek relief from the stay as a necessary predicate to terminating the bonding agreement, the Court concludes the bonding agreement should remain in effect.

Although allowing the bond to remain in effect pending a request for relief may seem unduly harsh in light of the Court's determination that the bond is a financial accommodation subject to termination, Merchants could have avoided this result by promptly seeking relief from the stay.

Consequently, the Court's initial ruling that Merchants is enjoined from cancelling the bond until further order of the Court will stand without prejudice to Merchants' right to seek relief from the stay.