**In re PRIME, INC., Debtor.**

**Bankruptcy No. 81–03200–S–11.**

United States Bankruptcy Court,
W. D. Missouri, S. D.

Nov. 12, 1981.

Gary A. Love, Springfield, Mo., for debtor.

Donald B. Steele, Kansas City, Mo., for CIT Corp.

## ORDER AUTHORIZING USE OF CASH COLLATERAL

JOEL PELOFSKY, Bankruptcy Judge.

Prime, Inc. is a good sized over-the-road trucking company, headquartered in Springfield, Missouri. Operating funds are obtained through accounts receivable financing by CIT Corporation. In August or September of 1981, Prime purged a substantial number of accounts as duplicates or as having credits against them. CIT became concerned as to the validity of the accounts being assigned and raised questions as to the future of the arrangement. Several meetings were held between Prime and CIT but the problem was not resolved. On October 15, 1981, Prime filed a bankruptcy under Chapter 11 of the Code.

On October 16, 1981, a Friday, CIT obtained a Temporary Restraining Order prohibiting Prime from using accounts receivable collections in accordance with the prohibitions set out in Section 363(c) of the Code, Title 11, U.S.C. A hearing on the use of cash collateral was set for October 20, 1981, arranged by telephone, and debtor filed its Motion to allow such use on October 19, 1981. At the hearing debtor appeared by counsel and its executive vice president. CIT appeared by counsel. Second National Bank of Ravenna, Ohio, the largest unsecured creditor, appeared also by counsel. Evidence was heard.

Under Chapter 11, a trustee may operate the business unless the Court orders otherwise, Section 1108. The debtor in possession, with some exceptions, has the powers of the trustee. Section 1107. Section 363(c)(2) provides that "the trustee may not use, sell or lease cash collateral under paragraph (1) of this subsection unless—

"(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing authorizes such use, sale, or lease in accordance with the provisions of this section."

When a court permits the use of cash collateral, the creditor is entitled to adequate protection of its security interest. Section 363(e) authorizes the court to condition such use "as is necessary to provide adequate protection of such interest." Methods by which adequate protection may be provided are set out, although not to be exclusive, in Section 361. "The precise form and sufficiency of such protection must be developed by the trustee ... and addressed to the sound discretion of the Court." *In re Heatron*, 6 B.R. 493, 494 (Bkrtcy.W.D.Mo.1980), 2 Collier on Bankruptcy, Paragraph 361.01 (15th Ed.).

Here debtor suggests that CIT is adequately protected because the amount of the accounts receivable is equal to the debt

and because CIT has a secured position in real and personal property which has value. In addition, there are some accounts not held by CIT the proceeds of which, when collected, will be paid over to CIT. The creditor says that the validity of the accounts is in serious question and it calculates the value at substantially less than the debt. CIT also contends that there is no credible testimony as to the value of the property and that the additional accounts have little value.

The evidence shows that debtor books an account when it picks up the merchandise. The amount of those accounts are reported to CIT which advances a fixed percentage of that amount to the debtor. When the account is collected, all of the collection is paid over to CIT. The volume of transactions ranges from $600,000 to $750,000 per week. CIT attempts to maintain the advances at about 80% of the overall amount of billings and collections. CIT has the right to reject a billing if it is over 90 days old or if experience demonstrates that the account is uncollectible. These ineligibles are returned to debtor for collection but any money collected is to be paid to CIT. At the time of these proceedings, the ineligible accounts amounted to about $700,000.

As long as the billing system has integrity, the arrangement works and CIT can advance funds and maintain sufficient cushion to protect against bad debt. What the evidence shows here is that billing system prior to bankruptcy, lacked adequate safeguard. Substantial accounts had to be purged, wiping out CIT's margin of safety and, if CIT's evidence is to be believed, causing the amount of accounts receivable assigned to be substantially less than the debt.

On the day of filing, so the debtor testified, the accounts receivable totalled $3,390,000, of which $721,000 were ineligible. The amount advanced was $2.6 Million and the collateral a little more. CIT's representative testified that the collateral was valued at about $2.43 Million, without consideration for claims, and may be as little as $1.8 Million. Neither party presented evidence as to exact value of each account or the possibility of collection. Rather each testified as to an opinion based upon experience.

From billing to collection, the time lapse is about thirty days. Debtor's witness testified that it needs about $600,000 a week to operate, although no budget was presented. Unless this financing arrangement continued, Prime would be out of business before the outstanding accounts could be verified. It is not the purpose of a Chapter 11 proceeding to close a business at the beginning. While CIT disputes the precise amount of money necessary to operate the debtor, it does not contest the notion that debtor needs money to survive. Nor does CIT refuse to be the source of the funds.

■ The debt financing arrangement is an executory contract from day to day. Section 365(c) provides, in part, that

"The trustee may not assume an executory contract ... of the debtor ... if ...

(2) such contract is a contract to make a loan, or extend other debt financing ... to or for the benefit of the debtor ..."

Read literally this section of the statute prohibits assumption whether the creditor consents or not. See *In re Adana Mortg. Bankers, Inc.*, 12 B.R. 977 (Bkrtcy.N.D.Ga. 1980) where the court held that a company servicing GNMA mortgages could not, in a Chapter 11 proceeding, assume that contract without the creditor's consent. In reaching this result, the court seemed to mix provisions of Section 365(c)(1) with those of Section 365(c)(2). The court is satisfied that, read in the context of the statutory powers given the trustee to operate a business, Section 365(c)(2) does permit assumption of a debt financing arrangement.

Section 1108 permits the trustee (the debtor in possession under Section 1107) to operate the debtor's business without affirmative order of the court. Section 363 permits the trustee to use, sell or lease property in the ordinary course of business and outside the ordinary course of business after notice and hearing. Section 364 per-

mits the trustee operating under Section 1108 to obtain credit as unsecured debt without court order and to incur secured debt after notice and hearing, *Matter of Borne Chemical Company, Inc.*, 9 B.R. 263 (Bkrtcy.N.J.1981), accompanied by the giving of administrative priority.

In light of these powers given the trustee, it is apparent that the Congress intended business under reorganization to proceed in as normal a fashion as possible. *Matter of Sullivan Ford Sales*, 2 B.R. 350 (Bkrtcy. Me.1980). Debt financing would have a major role in such reorganization, as is evident in this case. Without debt financing it is not likely that the debtor would survive until it generated enough cash to finance its daily operations. The statutory pattern permits the inference in the language of Section 365(c)(2) that the trustee may assume a contract for debt financing if the creditor consents. Here, the creditor having consented, the arrangement is lawful.

█ It is impossible to determine within a reasonable period of time, the value of the accounts receivable securing the debt owed CIT on the date of filing. Considering the volume of transactions, however, the answer will be known in about six weeks. In the interim, the effect of allowing debtor to use cash collateral is to create some risk of loss for CIT. The challenge is to determine that funding arrangement which will keep debtor operating while maintaining adequate protection for the creditor.

In addition to the accounts receivable assignment, CIT has a second mortgage on real estate and a security interest in inventory and spare parts of an approximate value of $600,000. This collateral, when taken with the valuation of the accounts, give CIT adequate protection of the existing debt. To maintain that adequate protection the Court finds that the future advances can be made based only upon new billings. The evidence is that the new billings have been subjected to more rigorous checks in the accounting system and should not suffer much dilution. Adequate protection will be afforded by more careful monitoring of the accounts, audits by CIT and

by reduction in the amount of the advance, together with the security arrangement previously described.

Use of cash collateral, therefore, is authorized upon the following terms and conditions, which were dictated into the record at the time of hearing:

1. Debtor is to make a daily report of new billings to CIT.

2. CIT, by agreement, will advance such sums of money, from day to day, averaging 70% of the value of eligible accounts receivable assigned by debtor. Such advances are to have an administrative priority.

3. Debtor is to collect and remit to CIT all amounts due and owing on all accounts assigned subsequent to the filing of the bankruptcy petition.

4. Debtor will collect and remit to CIT all amounts due and owing on all accounts assigned prior to the filing of the bankruptcy petition. No advances are to be made on these amounts. CIT agrees to credit such amounts to the pre-petition debt and to credit the excess, if any, against post-petition advances.

5. Debtor is to collect and remit to CIT all amounts due and owing on all accounts returned to debtor by CIT and declared to be ineligible.

6. Debtor is to pay over to CIT all funds collected from accounts receivable from the time of the filing of the bankruptcy to the close of business on October 20, 1981 less any funds expended in the ordinary course of business to the precise time the bankruptcy petition was received by the clerk of the court.

7. Debtor shall account to the Court for all funds expended in the ordinary course of business from the precise time of filing to the close of business on October 20, 1981. Creditor is granted a priority claim as to those funds.

8. Debtor shall account to the Court for all funds collected from the start of business on October 15, 1981 to the precise time of filing. The question as to whether such

amount is considered pre-petition debt or a priority claim is reserved.

9. CIT shall have the right to audit debtor's business two days each week, upon one day's notice. The audit is to be conducted in a businesslike manner and will avoid, insofar as possible, disruption of debtor's business activities.

10. CIT will furnish to the Court a weekly report of accounts assigned, payments received and advances made.

11. Debtor is to prepare an operating budget which it deems adequate for its operations. Such budget is to be provided to CIT and to be available at the hearing on November 10, 1981, at which time the Court will review the level of advances and the question of adequate protection.

### ORDER UPON REHEARING

After operating for a few days after October 10, 1981, at the 70% level of advances, and after having developed a summary analysis of expenses, debtor requested a rehearing on the level of advances. The hearing was held on October 27, 1981 and the parties appeared by counsel.

Evidence was presented showing that debtor's operating expenses and fixed costs were about $.85 a mile and that it required, therefore advances at 85% of the amount of the assigned accounts receivable if it was to continue to operate. Debtor also presented a cash flow projection through the end of November 1981. At that time the pre-petition advances would be paid down to $115,084 and the collateral assigned thereto would be depleted. Post-petition financing would be at 81.8% of the accounts assigned. Debtor requested advances at 85% for two weeks and then proposed reduction in the level to 80%.

CIT did not dispute the testimony as to expenses or the projections. It argued that debtor had now shown that it was operating at the most efficient level. It also argued that there was no evidence that the accounts assigned would be sufficient collateral for advances at that percent. There is, of course, no evidence which would re-

solve that contention except for the passage of time.

At this point in the proceedings, continued operation of the debtor is the most important of the several aspects of the issues. Debtor is asking CIT to increase its exposure substantially but the alternative is that debtor will not be able to function at an effective level.

The issue at this time has expanded beyond considerations of cash collateral to encompass the obtaining of credit under Section 364 of the Code. No unsecured credit in the amounts needed by debtor are available. CIT is willing to continue in an arrangement that falls within the description of Section 364(c)(2) and 364(d). In each instance the creditor is granted a lien on property of the estate. Since CIT is the secured party in such property, the question of adequate protection posed by Section 364(d)(1)(B) is moot.

The evidence shows that the pre-petition debt is adequately protected, subject to the reservations previously set out. As to the advances made at the 70% level, there appears to be sufficient cushion, in light of the testimony, to guard against dilution. Those advances, the Court concludes, are adequately secured. There is a little more question as to advances at 85%. Since debtor's survival is clearly at stake, the Court will order advances at such a level for the two weeks beginning October 26, 1981 and ending with the close of business on November 6, 1981. Such advances shall be against eligible accounts receivable assigned beginning October 26, 1981. No advances shall be required against collections. All other conditions set out in the Court's prior Order are incorporated herein. This Order is dictated into the record at the time of hearing.

The matter is set again for hearing on November 10, 1981 at 2:30 P.M. at Kansas City, Missouri.