### In re SUN RUNNER MARINE, INC., Debtor.

### CITIBANK, N.A., Appellant,

v.

### TRANSAMERICA COMMERICAL FINANCE CORPORATION, et al., Appellees.

**BAP No. EW–89–1623 VAsR.**
**Bankruptcy No. 89–01425–K11.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted: Jan. 19, 1990.

Decided Aug. 10, 1990.

Frank T. Pepler, San Francisco, Cal., for appellant, Citibank, N.A.

Nancy L. Isserlis–Spokane, Wash., for appellee Sun Runner Marine.

Scott R. Smith–Spokane, Wash., for appellee Transamerica Commercial Finance Corp.

Before VOLINN, ASHLAND, and RUSSELL, Bankruptcy Judges.

VOLINN, Bankruptcy Judge:

## OVERVIEW

This appeal concerns a "Manufacturer's Financing Agreement" ("the Agreement") between the debtor and Transamerica Commercial Finance Corporation ("Transamerica").[1] The Agreement was part of a pre-petition "floor financing" plan under which Transamerica financed certain of the debtor's customers' boat purchases from the debtor. The bankruptcy court granted Transamerica's motion and approved the debtor's stipulation for the assumption and cure of the Agreement, over the objection of Citibank, N.A. ("Citibank"), which holds secured and unsecured claims against the debtor. Citibank then appealed. We REVERSE.

## FACTS

The debtor/appellee, Sun Runner Marine, Inc., manufactures fiberglass recreational boats and sells them to retail dealers. Appellant Citibank was the debtor's primary lender, having loaned $5.5 million to the debtor in July of 1988. The loan, originally due on September 30, 1988, was secured by a blanket lien on all of the debtor's assets. The amount of the loan was later increased to $7 million, and the due date was extended to March 31, 1989.[2] On April 27, 1989, Citibank notified the debtor that no further extensions would be given. The next day the debtor filed its chapter 11 petition. Citibank is undersecured, and thus in addition to its secured claim, will have a large unsecured claim which may make it the debtor's largest unsecured creditor.

For several years prior to this bankruptcy, appellee Transamerica provided "floor financing" to certain of the retail dealers to whom the debtor sold boats. Thus, when the debtor sold a boat to one of those particular dealers, the dealer would contract to pay the purchase price over time to Transamerica, and Transamerica would immediately pay the full purchase price to the debtor. The contract between the dealer and Transamerica would be secured by a lien on the boat sold to the dealer. The dealer's repayment obligation and the security interest together are referred to as a "Wholesale Instrument."

The Agreement provided that if a dealer defaulted in the repayment of a Wholesale Instrument, the debtor was obligated, within 15 days after demand by Transamerica, to purchase the Wholesale Instrument from Transamerica for its unpaid balance. Thus the debtor was essentially a standby guarantor or surety for Transamerica's loans to the dealers.

The actual terms of the financing available to the dealers were contained not in the Agreement, but rather in two separate documents entitled "Sun Runner Marine, Inc. 1989 Purchasing Program" and "1989 Sunrunner Program," collectively referred to as the "Financing Plans." The Financing Plans provided, inter alia, for certain incentives that the debtor could offer to dealers to induce them to purchase boats from the debtor, including the debtor's agreement to pay to Transamerica the first 90 or 180 days' interest on a Wholesale Instrument.

Although the Financing Plans are not contracts per se, the appellees assert that they are incorporated into the terms of the Agreement. The Agreement refers to the Financing Plans in only one paragraph, which reads as follows:

> 2. BWAC [Transamerica's predecessor-in-interest] *may,* from time to time, purchase, otherwise acquire or enter into Wholesale Instruments *acceptable to BWAC in BWAC's sole discretion,* executed by, on behalf of or in the name of Dealers in accordance with the plan or plans of financing of BWAC in effect from time to time; such Dealers to be of

---

1. The Agreement, which is dated January 16, 1987, was originally between the debtor and Borg–Warner Acceptance Corporation ("BWAC"), Transamerica's predecessor-in-interest.

2. Citibank's opening brief gives this date as March 31, 1988, rather than 1989. Because in the same brief Citibank gives September 30, 1988 as the original due date, and "December of 1988" as the time the extension was given, we assume that the extension was until March 31, 1989, not 1988.

acceptable credit and financial responsibility to BWAC.

(Emphasis added).

The Agreement provides (in paragraph 11) that either party may cancel the Agreement at any time on thirty days' written notice. Such cancellation would not affect the debtor's conditional repurchase obligations with respect to Wholesale Instruments predating the termination.

After the debtor filed this bankruptcy, Transamerica moved to compel the debtor to assume or reject the Agreement under § 365.[3] In its motion Transamerica requested that the debtor be ordered to cure the following alleged payment defaults under the Agreement: (1) $58,270.77 (plus interest) for the purchase of a Wholesale Instrument pursuant to Transamerica's demand under the Agreement; (2) $66,826.45 in pre-petition interest and $43,021.84 in post-petition interest that the debtor was obligated to pay on behalf of various dealers, as provided in the Financing Plans; (3) $6,369.00 as a refund to Transamerica resulting from the fact that after Transamerica advanced to the debtor the purchase price of a particular boat, the debtor agreed with the purchasing dealer to discount the price by that amount, and that discount was reflected in the corresponding Wholesale Instrument.

The debtor wished to assume the Agreement, and by stipulation joined in Transamerica's motion. Citibank timely objected to the motion and to the assumption of the Agreement. After notice and a hearing, the bankruptcy court allowed the assumption and ordered the debtor to cure the defaults as alleged by Transamerica. Citibank timely appealed. It brought motions for a stay pending appeal before the United States District Court for the Eastern District of Washington, the bankruptcy court, the BAP, and the Ninth Circuit Court of Appeals, but the motions were denied in each forum.

## ISSUES

This appeal concerns an area of bankruptcy law where § 364, governing post-petition financing, and § 365, governing executory contracts, appear to overlap. Although § 364 was intended to govern post-petition financing, a debtor may enter bankruptcy with an unexpired contract governing his financial arrangements which might appear to be subject to § 365.

The court below recognized that the matter before it may have been more appropriately decided under § 364, but ultimately rendered its decision on the basis of § 365, as presented by the parties, approving the assumption of the Agreement as an executory contract.[4] Thus on appeal, we must review the bankruptcy court's decision both under § 365, as it was decided, and under § 364, which the court indicated could be relevant and which appellees now argue provides an independent basis for affirming the appealed decision.

The threshold question in determining whether § 365 applies is whether the Agreement is an "executory" contract. The demarcation between the respective domains of §§ 364 and 365 is contained in § 365(c)(2), which prohibits the assumption of "financial accommodation" contracts, thereby consigning issues pertaining to post-petition financing to § 364. Thus we must first determine whether the Agreement is a financial accommodation contract, and if it is, whether a financial accommoda-

---

**3.** Section references refer to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, unless otherwise specified.

**4.** In its oral ruling, the court stated:

What causes me more problem in this case is the issue of, is there really an executory contract or is this just a disguised loan that should be considered under § 364.

. . . .

So I guess what I am saying is, I am going to approve the order in its present form. Although I do have some apprehension as to whether the form is the appropriate form or whether we should just simply be considering a post-petition financing in this case.

. . . .

But viewing substance over form, I'm not going to require the parties to redo all the paper work at this point. And I will approve it as the assumption of an executory contract. Verbatim Report of Proceedings, Appendix to Appellant's Opening Brief, appendix 7, pp. 31–32.

tion contract may be assumed if the non-debtor party consents.

## STANDARD OF REVIEW

The issues on this appeal relate solely to the application of §§ 364 and 365 to facts that are not in dispute. These are legal issues which we review *de novo*. *In re Wolf & Vine*, 825 F.2d 197, 199 (9th Cir. 1987).

## DISCUSSION

### A. Section 365

#### 1. Whether the Agreement is an Executory Contract

■ Section 365 authorizes the assumption only of contracts that are executory. The Ninth Circuit has generally adopted the "Countryman definition," according to which a contract is executory if the obligations of both the debtor and the non-debtor party remain so far unperformed that failure of either to complete performance would constitute a material breach excusing performance of the other. *In re Munple, Ltd.*, 868 F.2d 1129, 1130 (9th Cir.1989); *In re Pacific Express, Inc.*, 780 F.2d 1482, 1487 (9th Cir.1986).

The debtor's essential unperformed obligation under the Agreement is to repurchase on demand any defaulted Wholesale Instruments. On the face of the Agreement, however, Transamerica had no obligations that satisfy the Countryman definition. Although the Agreement does require Transamerica to perform "floor checks" of the financed boats at the dealers' locations, the Agreement specifically provides that failure to do so would not excuse the debtor's performance.

As for financing dealer boat purchases, the Agreement provides only that BWAC (Transamerica's predecessor) *"may ...* enter into ... Wholesale Instruments acceptable to BWAC *in BWAC's sole discretion"* (emphasis added), but contains no explicit obligation to finance any boat purchases. The appellees argue that the implied duty of good faith [5] transforms the permissive

into the mandatory, but we question whether Transamerica's refusal to finance further dealer boat purchases would excuse the debtor's repurchase obligations under the Agreement.

Even if Transamerica does have an implied duty of good faith in determining whether to finance a particular dealer boat purchase, the debtor's precarious financial situation may well excuse Transamerica's further performance since in making those loans, Transamerica relies at least in part on the credit of the debtor via the debtor's repurchase obligation.

Finally, the terms of the Agreement themselves grant Transamerica the absolute right to terminate the Agreement on 30 days' written notice. Thus any obligation to perform is virtually terminable at will.

We hold that the Agreement is not an executory contract because Transamerica has no obligations under the Agreement that remain so far unperformed that Transamerica's failure to complete performance would constitute a material breach.

#### 2. Whether the Agreement is a Financial Accommodation Contract

■ As they must, appellees argue not only that the Agreement is executory, but further that it is not disqualified from assumption under § 365 as a financial accommodation contract. Assuming arguendo that the Agreement or the parties' course of conduct gave rise to mutually enforceable expectations sufficient to render the Agreement an executory contract, we conclude that the Agreement still would not be assumable because it is a financial accommodation contract. Section 365(c) provides:

> The trustee *may not* assume or assign any executory contract ... if—
>> (2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor....

(emphasis added). The appellees assert that the Agreement is not a financial accommodation contract within the meaning

---

**5.** *See* RCW 62A.1–203 (UCC § 1–203).

of § 365(c)(2) because the Agreement is neither a contract to make a loan nor debt financing, and no loans are actually made directly from Transamerica to the debtor under the terms of the Agreement.

These arguments are not convincing.

The term "financial accommodation" has been defined as the extension of money or credit to accommodate another. *In re Adana Mortgage Bankers, Inc.*, 12 B.R. 977, 986 (Bankr.N.D.Ga.1980); *accord, In re Wegner Farms Co.*, 49 B.R. 440 (Bankr.N.D.Iowa 1985).

*In re Placid Oil Co.*, 72 B.R. 135, 139 (Bankr.N.D.Tex.1987). The Agreement clearly contemplates Transamerica's extension of money or credit in the form of loans to the dealers. The proceeds, however, are disbursed directly to the debtor, the debtor incurring secondary liability for the repayment of the dealer loans through the Agreement. These loans are admittedly made to accommodate the debtor; in fact the appellees have argued throughout these proceedings that these loans are an indispensable means of financing the debtor's business. Thus the Agreement is a contract for financial accommodations for the benefit of the debtor, and is within the purview of § 365(c)(2).

### 3. *Whether the Lender's Consent Renders a Financial Accommodation Contract Assumable*

■ The appellees next argue that even if the Agreement is a financial accommodation contract, § 365(c)(2) should not prohibit its assumption when both the debtor and the other contracting party (Transamerica) consent to its assumption. The appellees urge that § 365(c)(2) protects unwilling lenders from the debtor's assumption of a financial accommodation contract, but should not thwart the assumption of such a contract if the lender and the debtor (or trustee) both wish the contract to be enforced. There is a surface appeal to this argument; while it seems clear that a financially troubled debtor should not be allowed to impose itself on an unwilling lender by virtue of § 365, it is not as readily

discernible why that statutory prohibition should apply where the lender is willing.

At the outset, we note that in general, § 364 governs post-petition credit, while § 365 governs the continuation, post-petition, of pre-petition contractual relations. There is clearly room for overlap where the debtor's pre-petition financing is governed by a contract which, by its terms, would have continued after the petition date absent bankruptcy. But with the advent of the bankruptcy, the Code detached the function of prospective financing from existing credit arrangements through § 365(c)(2), which prohibits the assumption of financial accommodation contracts without regard to the lender's consent. Post-petition financing arrangements are thus governed solely by § 364.

It is unlikely that the absence of an exception for consenting lenders is a mere oversight of the drafters. By way of comparison, § 365(c)(1) prohibits the assumption of certain contracts if state law excuses the non-debtor party from accepting performance by an entity other than the debtor. That subsection, however, explicitly prohibits assumption *only* when the non-debtor party to the contract does not consent to assumption. Section 365(c)(2) is the very next subsection, and it prohibits the assumption of all financial accommodation contracts with no reference to the consent of the non-debtor party to the contract.

Such an interpretation is also consistent with the Code's overall approach to post-petition financing. Section 364 provides certain incentives that a debtor may offer, with court approval, to induce a potential lender to extend credit post-petition. These incentives include granting the lender an administrative expense priority claim under § 364(b), a "super-priority" claim under § 364(c)(1), or a lien on unencumbered estate assets under § 364(c)(2) or (3), on account of the *post-petition* credit extended. Section 364 does not, however, authorize the debtor to pay the lender's *pre-petition* unsecured claim as a condition precedent to the post-petition financing.[6] Permitting

---

**6.** Sections 549 and 1129(b)(2)(B) (the absolute priority rule) generally prohibit the payment of

the assumption of a financial accommodation contract would allow a post-petition lender, such as Transamerica in this case, to receive full payment on its pre-petition unsecured claim under § 365(b)(1).[7] This benefit to the lender would be at the expense of the other unsecured creditors, such as Citibank in this case, because it would diminish the estate assets available to satisfy their claims. Thus the § 365(c)(2) prohibition against the assumption of financial accommodation contracts protects all unsecured creditors, not just the lender, and the lender's consent alone is not sufficient to abrogate it.

This point was recognized by the court in *In re Placid Oil Co.*, 72 B.R. 135 (Bankr.N.D.Tex.1987). In that case, the financing creditor urged that a contract be assumed, but the court held that it was a financial accommodation contract and therefore § 365(c)(2) prohibited its assumption despite that consent. 72 B.R. 135, 139 (Bankr.N.D.Tex.1987). In reaching that conclusion, the court noted that

> The prohibition against assumption of contracts for "financial accommodation" exists for the protection of a party who has made a yet unperformed lending commitment, but the prohibition is for the benefit of all claimants against the estate as well.

*Id.* (citations omitted).

The appellees cite *In re Prime, Inc.*, 15 B.R. 216 (Bankr.W.D.Mo.1981), for the proposition that § 365(c)(2) does not prohibit the assumption of a financial accommodation contract if both the trustee and the lender wish the contract to be assumed. The *Prime* court noted that both the debtor and CIT wished to continue the accounts receivable financing post-petition as it had been conducted pre-petition, and also correctly observed that "[r]ead literally

[§ 365(c)(2) ] prohibits assumption whether the creditor consents or not." *Id.* at 218 (citation omitted). The court went on, however, to review various general provisions of the Bankruptcy Code permitting the trustee (or debtor in possession) to operate the debtor's business and incur debt, and concluded that "it is apparent that the Congress intended business under reorganization to proceed in as normal a fashion as possible." *Id.* at 219 (citation omitted). The court noted the importance of debt financing to the debtor's financial survival, and concluded:

> The statutory pattern permits the inference in the language of Section 365(c)(2) that the trustee may assume a contract for debt financing if the creditor consents. Here, the creditor having consented, the arrangement is lawful.

*Id.* at 219.

We find this reasoning unconvincing. When the words of a statute are unambiguous, the court's inferences should not override the plain language of the statute. *Ex parte Collett*, 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207, 1211 (1949); *Carlson v. Comm'r*, 712 F.2d 1314, 1315 (9th Cir.1983). Section 365(c)(2) unambiguously prohibits the assumption of financial accommodation contracts, regardless of the consent of the nondebtor party.

In any event, we disagree with the *Prime* court's inferences. As the court in *Placid Oil* observed, § 365 is designed to protect not only the interests of the parties to the executory contract in question, but also the interests of all of the creditors.[8] 72 B.R. at 139. The assumption of financial accommodation contracts may have considerable impact on creditors who are not parties to the contract since assumption may entitle the nondebtor party to a distribution of estate assets on account of any

---

one unsecured claim in full when other unsecured claims are not, absent the consent of the other unsecured creditors. *See also In re FCX, Inc.*, 60 B.R. 405, 410–12 (E.D.N.C.1986).

**7.** Section 365(b)(1) provides in pertinent part:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such con-

tract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default. . . .

**8.** For example, under § 365(a) court approval must be obtained for the assumption of a contract even if the parties to the contract consent to assumption.

pre-petition default, and to a priority claim on account of any post-petition default. The fact that § 365(c)(2) is not dependent on the potential lender's lack of consent is therefore consistent with the policy of the Bankruptcy Code. If the lender is willing to provide post-petition financing, then § 364, with its separate and extensive provisions concerning post-petition financing of the debtor, and its attendant protections for creditors other than the lender, is the proper vehicle for such a financing arrangement.

## B. Section 364

■ The appellees argue that even if the bankruptcy court erred in holding that the Agreement was an assumable executory contract, the bankruptcy court's order was authorized under § 364 concerning post-petition financing.

In ordering assumption of the Agreement as an executory contract, the bankruptcy court ordered that the debtor cure all defaults under the Agreement. The cure included the payment of approximately $175,000 in payment defaults. Section 365 provides for the cure of defaults upon the assumption of an executory contract, but as discussed above, we hold that § 365 does not apply in this case. While § 364 authorizes the grant of priority or a security interest in estate assets in order to provide some assurance to post-petition lenders, the assurances so authorized do not include payment of pre-petition unsecured debt with estate assets. There is no other applicable provision in the Bankruptcy Code authorizing the debtor to pay certain pre-petition unsecured claims in full while others remain unpaid.[9] To do so would impermissibly violate the priority scheme

of the Bankruptcy Code. *See In re FCX, Inc.*, 60 B.R. 405, 410–12 (E.D.N.C.1986).

The appellees argue that some bankruptcy courts have allowed "cross-collateralization" under § 364 where absolutely necessary to enable the debtor to obtain necessary post-petition financing, and that by analogy the outright payment of pre-petition unsecured claims should be permitted in that context.[10] The only authority from this jurisdiction cited by the appellees approving cross-collateralization is *In re Adams Apple, Inc.*, 829 F.2d 1484 (9th Cir.1987). The court in *Adams Apple* held only that where the bankruptcy court grants cross-collateralization under § 364, post-petition credit is extended to the debtor in reliance thereon, an appeal is taken, and no stay pending appeal is sought, § 364(e)[11] renders the appeal moot because even reversal would not affect the post-petition lender's rights. *Id.* at 1488. The court explicitly declined to rule whether the Bankruptcy Code authorizes cross-collateralization. *Id.* at 1488–89, n. 6.

We also decline to rule whether cross-collateralization is appropriate in this case, or whether as a matter of law it is ever permissible. In its oral ruling the court below stated:

> [T]he 9th Circuit Court of Appeals has made it quite clear to me in the Adams Apple case, which was one of my cases, that cross-collateralization, or, if you will, the use of financing to pay a prepetition unsecured debt is to be used only in extreme cases.
>
> And I think to my recollection the Adams Apple case is about the only case where I have previously permitted that. I felt there were very compelling circumstances in that particular case. I'm not

---

**9.** Section 510(c) does provide for equitable subordination of claims, but that doctrine has been neither raised nor implicated in this case.

**10.** Cross-collateralization means granting a security interest in post-petition assets to secure pre-petition debts.

**11.** Section 364(e) provides:
The reversal or modification on appeal of an authorization under this section to obtain

credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

sure that that's not the situation that we're really faced with here.

. . . . .

But viewing substance over form, I'm not going to require the parties to redo all the paper work at this point. And I will approve it as the assumption of an executory contract.

The parties did not argue to the bankruptcy court whether cross-collateralization was appropriate to induce Transamerica to extend financing under § 364, and the bankruptcy court explicitly did not reach that issue, making its ruling on the legal basis presented to it, *i.e.*, § 365. We do not know what legal standard the bankruptcy court would have applied, or whether the bankruptcy court would have found facts warranting cross-collateralization, had that issue been presented to it. Thus the question of whether the bankruptcy court would have allowed cross-collateralization under § 364 is hypothetical, and the bankruptcy court's order can not now, ex post facto, be justified on that basis.[12]

 This appeal is not moot under *Adams Apple.* First, the order appealed here has prospective effect as to the administration of the estate because it provides for ongoing financing under the terms of the Agreement. Second, § 364(e) does not shield any cure payments from the effect of our reversal of the appealed order. Section 364(e) explicitly applies only to "an authorization *under this section* to obtain credit or incur debt, or … a grant *under this section* of a priority or a lien" (emphasis added). Transamerica sought and the bankruptcy court ordered the cure payments under § 365, not § 364, and therefore those payments are not protected by

§ 364(e). The same is true for any other claims, priorities, liens, or other benefits granted Transamerica under the appealed order, excepting only the provisions of paragraph 3 of the appealed order,[13] which specifically invokes § 364(b).

## CONCLUSION

From the transcript of the proceedings below, it is clear that the bankruptcy court's ruling was a pragmatic one, directed toward permitting the maintenance, post-petition, of existing arrangements for dealer financing. *See* fn. 4, *supra.* The debtor and the court considered the financing provided by Transamerica to be vital to the reorganization effort. Transamerica used the resulting bargaining power to require the repayment of its pre-petition unsecured claim as a condition to post-petition financing. Because § 364 does not authorize post-petition financing on those terms, Transamerica and the debtor sought approval of post-petition financing under § 365 in order to make use of the cure provisions of that section. Section 365(c)(2) prohibits such an "end run" around § 364. The bankruptcy court's order is therefore REVERSED.

---

12. Nor do we decide whether the post-petition payment of pre-petition unsecured claims would be permissible even if the law and the facts did warrant cross-collateralization.

13. That paragraph provides:
The parties hereby stipulate that any unsecured debt incurred by Transamerica as a result of assumption of the Flooring Agreement is a credit accommodation pursuant to 11 U.S.C. § 364(b) and shall constitute an administrative expense pursuant to the terms of 11 U.S.C. § 503(b)(1).

It is not clear, either from the language of this paragraph, or from the remainder of the record before us, to what this paragraph refers. It appears to refer narrowly to any new funds extended by Transamerica to the debtor post-petition, on an unsecured basis. The record before us does not disclose whether Transamerica holds any claims that fall within the intended scope of this paragraph, and therefore we do not decide whether § 364(e) has any application in this case.