**In re DYNACO CORPORATION, and Dynaco West Corporation, Debtors.**

**Bankruptcy Nos. 93–12141–JEY, 93–12142–JEY.**

United States Bankruptcy Court, D. New Hampshire.

Dec. 21, 1993.

William Gannon, Wadleigh, Starr, Peters, Dunn & Chiesa, Manchester, NH, for debtor.

Charles L. Glerum, Choate, Hall & Stewart, Boston, MA, Bruce Harwood, Sheehan, Phinney, Bass & Green, Manchester, NH, for State Street Bank & Trust Co.

Steven M. Notinger, Wiggin & Nourie, Manchester, NH, for Official Creditor Committee.

Daniel W. Sklar, Peabody & Brown, Manchester, NH, for Howe Realty Development.

Geraldine Karonis, Manchester, NH, for U.S. trustee.

## Memorandum Opinion

JAMES E. YACOS, Chief Judge.

These jointly administered chapter 11 cases came before the Court for hearing on October 5, 1993 and October 14, 1993 upon debtors' Motion for Continued Use of Cash Collateral, filed on October 1, 1993, and an Objection thereto filed by State Street Bank & Trust Company, the secured creditor having a claim upon the cash collateral involved. The Official Committee of Unsecured Creditors supports debtors' requested use of cash collateral. *See Memorandum in Support of Motion to Use Cash Collateral* (Court Doc. No. 98). By Order dated November 3, 1993, I authorized debtors' continued use of its cash collateral with certain limitations. *See Order Authorizing Use of Cash Collateral*, BK Nos. 93–12141–JEY and 93–12142–JEY, slip op. (Nov. 3, 1993) (Ct.Doc. No. 118). This Memorandum Opinion sets forth the reasoning and legal authority supporting the Order. This Opinion is based on the record established as of the time of the entry of the aforesaid Order.

The issue presented by debtors' cash collateral request is whether a court can grant debtors' requested use of cash collateral when the record indicates that debtors' collateral base will suffer a decline of approximately $540,000 in the third and fourth months of post-petition operation, but when further documentation shows that debtors will reverse that decline and restore the original level over a more extended operational period.

After a review of the entire record in this matter, including considerable testimony and documentary evidence, extensive oral arguments of counsel, memoranda and supplemental memoranda, the Court determines that it is appropriate to consider the long-term picture of debtors' business projections rather than a short-term snapshot, and that in this instance the debtors have established grounds warranting their use of their cash collateral, such grounds consisting of a showing of adequate protection to the objecting creditor and realistic projections of equity over an extended operational period. The bases for these determinations are discussed below.

### Facts[1]

These debtors operated plants in New Hampshire (Dynaco Corporation) and in Arizona (Dynaco West Corporation) on an affiliated basis producing circuit boards for the use of various large manufacturing concerns in this country. Their customer base was made up of prime corporations that were well

---

1. These facts were set forth in my Order dated November 3, 1993, but for the sake of readability I restate them here.

satisfied by the work produced by the debtors. The debtors' receivables show a historical collection rate of 98 percent, which corroborates this satisfaction. The debtors' financial problems stem from the declining defense spending by the federal government in recent years, debtors' need to shift more of their work into civilian contracts, and debtors' accompanying need to reduce their costs during the transitional period.

The debtors had determined in 1992 that due to the decline in defense spending and contracting, which was a large part of their business, they would have to shift more of their work into civilian contracts. They also recognized that they would no longer be able to cover the overhead in the two plants. Accordingly, in the Spring of 1993 they determined, with the concurrence of State Street Bank & Trust Company, that the operations should be consolidated into the Arizona facility. Under federal law they were required to give a 60–day notice to their employees about the termination of the New Hampshire operations. This notice was given on May 18, 1993. Surprisingly, many of the employees left earlier than expected and the debtors were presented with a situation in which they had to cover a reduced operation with high overhead expenses in New Hampshire. It was important for debtors to maintain their operations since preservation of the customer base was a primary goal.

State Street Bank & Trust Company, the objecting creditor here, agreed to the consolidation of operations into Arizona, and the costs involved, as being appropriate to preserve the customer base of these debtors and to reduce overhead costs. However one "cost" which evidently was not fully evaluated by either the debtors or the Bank prior to debtors' consolidation was the danger that the disruption of customer orders even before the actual period of the move might interrupt the acceptance of customer orders and in effect cause an additional decline in cash flow for that reason. The debtors had assumed that their Derry employees would stay for the two months prior to the chapter 11 filing to accept and service orders in a more or less normal fashion before the move but as indicated above many of the employ-

ees left early. The "two-month glitch" caused by this development is at the heart of the financial problem which has led to the present dispute between the debtors and State Street Bank & Trust Company.

On July 23, 1993, debtors' filed for relief under Chapter 11 of the Bankruptcy Code. On July 27, 1993, debtors filed an Emergency Motion for Authority to Use Cash Collateral (Court Doc. No. 7), which the Court granted that date with the limitation that such usage extended only until a hearing could be held on the accompanying financing agreement. *See Order and Memorandum Opinion,* 158 B.R. 552 (Bankr.D.N.H.1993) (Court Doc. No. 10). Thereafter the Court entered a series of orders continuing and extending debtors' authority to use cash collateral. *See Order Authorizing Continued Cash Collateral Usage,* slip op. at 2 (Nov. 3, 1993) (Court Doc. No. 118) (listing prior interim cash collateral orders). All but the initial limited order were consented to by State Street Bank & Trust Company. By orders entered in August 1993, the Court authorized debtors to continue and complete their planned movement of the Derry, New Hampshire plant and equipment to the Tempe, Arizona facility.

*Cash Collateral Adequate Protection*

 Debtors seeking to reorganize under Chapter 11 of the Bankruptcy Code frequently need to use their cash and proceeds therefrom in order to continue with their business operations. However said cash and proceeds are often subject to security interests of pre-petition lenders and debtors must obtain court authorization to use this "cash collateral". 11 U.S.C. § 363(b). The Court must ensure that, to the extent the debtor is entitled to use cash collateral, there is adequate protection of the creditor's security interest so as to maintain the "benefit of the bargain" that the secured creditor originally made with the debtors. 11 U.S.C. §§ 361, 363(e). This requires a showing that the value of the creditor's security interest is protected and the debtor's use of cash collateral will not threaten that interest. H.R.Rep. No. 95–595, 95th Cong., 1st Sess.

339 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787; 2 *Collier on Bankruptcy* ¶ 363.03 (15th ed. 1993). As one court explained:

> In reviewing an application under 11 U.S.C. § 363 which provides for the use of cash collateral, the Court must balance two irreconcilable and conflicting interests. The holder of a lien on cash collateral must not be left unprotected by unrestricted use of the collateral by the debtor. However, the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary in order to operate a business.

*In re Stein,* 19 B.R. 458, 459 (Bankr.E.D.Pa. 1982).[2] Another court observed that, in view of the broad powers given a trustee (or debtor-in-possession under § 1107), "it is apparent that the Congress intended business under reorganization to proceed in as normal a fashion as possible." *In re Prime, Inc.,* 15 B.R. 216, 219 ((Bankr.W.D.Mo.1981), *citing Matter of Sullivan Ford Sales,* 2 B.R. 350 (Bankr.D.Me.1980).

■ The pertinent inquiry to ascertain whether the Bank's security interest is adequately protected requires a determination of the value of the Bank's interest and whether the debtors' proposed use of their cash collateral would impair that interest. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 339 (1977); 2 *Collier on Bankruptcy* ¶ 363.03 (15th ed. 1993). Adequate protection will take many forms, only some of which are set forth in section 361 of the Bankruptcy Code, 2 *Collier on Bankruptcy* § 361.01[1] at 361–6 (15th ed. 1993), and must be determined based upon equitable considerations arising from the particular facts of each proceeding. *In re Briggs Transportation Company,* 13 C.B.C.2d 1289, 780 F.2d 1339 (8th Cir.1985); *In re High Sky, Inc.,* 4 C.B.C.2d 1290, 15 B.R. 332 (Bankr.M.D.Pa.1981).

■ With regard to a lien of this nature, i.e., a "floating lien" of a blanket nature on changing and cycling soft collateral[3], the appropriate adequate protection, and the concomitant valuation of collateral appropriate for a determination of adequate protection, is a showing that the *level* of such a fluctuating base of items of collateral that are constantly cycling through different shapes and forms, as the business operation continues, will in fact remain at the same magnitude (in terms of ongoing operational values) during the relevant period of debtor-in-possession business operation in the chapter 11 reorganization proceedings.[4]

■ The appropriate view of a relevant period for this purpose is not a "snapshot" showing a fluctuation downward, during one selected short period of the business operation, but rather a "motion picture" showing the cycling of soft collateral during a period long enough to evaluate the question of whether the secured creditor is or is not being exposed to a substantial danger of a permanent decline in the level of the soft collateral supporting its floating lien. If the debtors make a solid showing that their continued operation of their business during the relevant period will pose no serious danger of such a decline, there is no need for any additional adequate protection in terms of "new money" to be infused into the enterprise by the equity holders or junior credi-

2. *See also In re Jug End in the Berkshires,* 46 B.R. 892, 898–899 (Bankr.D.Mass.1985), *citing* H.Rep. No. 595, 95th Cong., 1st Sess. 343–44 (1977) ("Adequate protection, as derived from the fifth amendment protection of property interests, reconciles the competing interests of the debtor, on the one hand, who needs time to reorganize free from harassing creditors, and the secured creditor, on the other hand, who is entitled to constitutional protection for his bargained for property interest."); *In re Smithfield Estates, Inc.,* 48 B.R. 910, 914 (Bankr.D.R.I.1985) ("The weight of authority ... hold that adequate protection relates to maintaining the status quo for the period after the filing of the petition and before confirmation or rejection of the plan.")

3. From raw materials into work-in-process, into inventory, into receivables, into cash, into purchase of new raw materials.

4. *See e.g., In re Markim,* 15 B.R. 56 (Bankr. E.D.Pa.1981) (Debtor's monthly payments to its secured creditors, "together with its significant improvements in the efficiency of its operations clearly provide those creditors with adequate protection of their interests."); *cf. also In re T.H.B. Corp.,* 85 B.R. 192, 194–95 (Bankr. D.Mass.1988).

tors to protect the secured creditor's present position in the collateral. On the other hand, if the evidence before the Court establishes that a permanent decline in the soft collateral level is likely, the Court generally will require infusion of cash by the investors in the enterprise to assure adequate protection of the security interest involved, under the rubric that the Court will not allow the debtors to "risk other people's money" to salvage their own position.

■ The rationale for this approach stems from the underlying rationale of chapter 11 itself, i.e., a rehabilitative proceeding in which the goal is to restructure the debtors' finances and operations in such manner as will extract the maximum intrinsic value of the enterprise. Since the equity holders and the general unsecured creditors are at the bottom of the "totem pole" of priority of claims against the assets of the enterprise, it is often tempting for those junior interests to don rose-colored glasses in evaluating the prospects for future operations and reorganization. It is the Court's task to scrutinize the data and projections supplied by the debtors with this danger in mind. When the issue is raised early in the reorganization proceeding, the Court will generally permit the business operation to continue, at least to the point of plan formulation, if the debtors make a solid evidentiary showing to support their projections that survive the appropriate scrutiny. It is always a difficult judgment call early in the case but I believe these debtors have met that standard.

In *In re T.H.B. Corp.*, 85 B.R. 192 (Bankr. D.Mass.1988), the bankruptcy court was presented with a cash collateral request and held that, because the senior lienholder's security interest was adequately protected, the debtor could use its cash collateral. In making its adequate protection determination, the court noted as an alternative basis for decision that under one theory of adequate protection "the concept consists of stability in collateral value rather than any particular level of value." *Id.* at 194, *citing Bankers Life Insurance Co. v. Alyucan Interstate Corp.*, 12 B.R. 803 (Bankr.D.Utah 1981) and *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 368, 108 S.Ct. 626, 629, 98 L.Ed.2d 740 (1988). The court further observed that part of the Bank's adequate protection was the "fact that the proceeds of accounts receivables are being used by the Debtor to generate new inventory and accounts", *Id.* at 193, and that "[t]he use of the Bank's cash collateral ... is an element of the Bank's adequate protection", *Id.* at 195, similar to my findings in this case. *See also Federal Nat. Mort. v. Dacon Bolingbrook Assoc.*, 153 B.R. 204, 214 (N.D.Ill.1993) (security interest adequately protected to extent debtor reinvested rents in operation and maintenance of the property); *In re Stein*, 19 B.R. 458, 460 (1982) (cash collateral usage allowed where such use is essential "in order to meet operational costs" ... and where the "secured position can only be enhanced by the continued [business] operation....").[5]

■ In the present case the debtors have made an effective showing that, notwithstanding a drop in the third and fourth months of operation in the level of the soft collateral involved, up to a maximum of $540,000 of value on a going concern basis, the business operation will in fact result in the original level of that soft collateral being restored by June of 1994, such original level being $5,400,000 as of September 26, 1993.[6]

---

5. For a discussion of this situation under the prior Bankruptcy Act, under which there was no specific provision dealing with cash collateral, see *Matter of American Kitchen Foods, Inc.*, 9 C.B.C. 537, 2 BCD 715, 1976 WL 23699 (Bankr. D.Me.1976), in which the court noted: "It is now axiomatic that *mere retention* of collateral by the debtor after default and the use of collateral proceeds to the extent necessary to preserve or enhance the value of the collateral represent no impairment." *Id.* at 547 (emphasis in original), citing *Wright v. Vinton Branch Bank*, 300 U.S. 440, 466–67, 57 S.Ct. 556, 563–64, 81 L.Ed. 736

(1937); *Adair v. Bank of America Nat. Trust & Savings Assn.*, 303 U.S. 350, 360–62, 58 S.Ct. 594, 599–601, 82 L.Ed. 889 (1938); *RFC v. Kaplan*, 185 F.2d 791, 798 (1 Cir.1950).

6. The date of September 26, 1993 is relevant in that it was at that point that the State Street Bank & Trust Company indicated that it would not consent to any further use of cash collateral and stated it would oppose the debtors' request for further cash collateral usage. The argument by the Bank that the original filing date of July 23, 1993 should be employed as a baseline level

The primary cause of the current decline in the level of soft collateral was the fact that the move of the New Hampshire plant and equipment to the Arizona plant not only took somewhat longer than planned but also, as noted above, caused an unplanned early interruption in their ability to take new orders and to perform the same. This temporary interruption and decline, in my judgment, is an aberration and does not take away from the debtors' demonstrated ability to generate new business in the civilian marketplace, to collect an extraordinarily high percentage of their receivables from their customers, and to manage their affairs more efficiently and more effectively with the changes that have been incorporated into the Arizona operation with the aid of the professional management group authorized by prior Court order.

While the total collateral available to the Bank includes equipment, which is not cash collateral pursuant to the statutory definition in 11 U.S.C. § 363(a), the parties in the present case have stipulated to a fair market value of $546,000 and a forced sale value of $415,000 for the equipment and there is no evidence in the record indicating any significant decline in either of those values during the relevant period. For simplicity, this decision will regard the equipment as a neutral factor in terms of the cash collateral usage question presented.

The Court specifically finds on the evidence presented that the debtors will be able to reach their $15 million projected level of sales during their 1994 fiscal year ending September 30, 1994, and that their effective cost-cutting, quality control, and increased efficiency measures already adopted will support the net results included within its projections for its 1994 fiscal year. The debtors have made a very strong showing in that regard. The objecting creditor called no witnesses to the contrary and relied only on cross-examination to make its rebuttal case. That rebuttal effort in my judgment did not shake the otherwise convincing testimony put forward by the debtors.[7]

The alternative is to force the debtors to close down their operations and thus doom any effort at reorganization which will hopefully extract the maximum value of the assets involved to the benefit of *all* classes of creditors and other constituencies involved in this case.

■ The objection by the secured creditor, to the extent that it relies on the decision in *In re Tenney Village Co., Inc.*, 104 B.R. 562 (Bankr.D.N.H.1989), is misplaced. That decision, by visiting Judge Queenan, involved a determination under section 364 of the Bankruptcy Code as to whether a new financing party would be given a super-priority lien that would prime existing liens upon the property in question. The Court there ruled that a § 364 priming order displacing existing liens must clearly show that after the super-priority lien is placed upon the property the existing lien holders' security interests, valued in terms of what they could obtain from a commercially reasonable disposition of the property in question, would leave them unimpaired notwithstanding the priming lien.[8] The Court also, in an alterna-

---

for adequate protection purposes is not sustained in my view by either the logic and purpose of the inquiry being made or under the applicable case law. *See Matter of Haiflich*, 63 B.R. 314, 316 (Bankr.N.D.Ind.1986), *citing* 3 *Collier on Bankruptcy*, ¶ 506.04[2] (15th ed. 1985), and *Matter of Continental Airlines, Inc.*, 146 B.R. 536, 539 (Bankr.D.Del.1992), *citing In re Best Products Co., Inc.*, 138 B.R. 155 (Bankr.S.D.N.Y.1992) ("The court agrees with the Debtor that in the absence of controlling precedent the better view is that adequate protection may only be awarded from the date movants seek relief."). The present case really "began" for all pertinent present purposes at the end of September, 1993, after the consummation of the agreed-upon consolidation of operations in Arizona (agreed both pre- and

post-bankruptcy with State Street Bank & Trust Company).

7. The Bank called no witnesses to refute the uncontroverted testimony and analysis put forward by the debtors that regardless of any other issues there was no question that the debtors could operate on a break-even basis for at least six months and that there was no danger that there might be a termination in operations during that period. Therefore I accept the debtors' contention that there is no reason to focus on liquidation scenarios at this time.

8. It should be noted that the issue in *Tenney Village* involved "static assets" and not the "cycling" type of collateral involved in the present case. As will be pointed out below this differ-

tive ruling, noted the egregious overreaching by the proposed new financing party, including the proposed inappropriate granting of new security for that party's own prepetition unsecured claims. The Court in *Tenney Village* clearly indicated that the requested super-priority lien would not be granted in any event on the latter basis alone.

To the extent that some general statements in the *Tenney Village* opinion may be interpreted to read out of section 506(a) of the Bankruptcy Code the Congressional direction that valuation of a secured creditor's interest in the collateral "shall be determined in light of the purpose of the valuation", I do not agree *and in any event those general statements were not necessary to the decision.[9] In my view it makes a big difference whether we are talking about a § 364 priming lien situation, in which the total encumbrances against the property of the estate are being *increased* compared to a § 363 proposal for the use of cash collateral in which the pertinent inquiry is whether the level of the fluctuating collateral involved will be *maintained*.

If the objecting creditor's reading of the *Tenney Village* opinion were to be carried over to the § 363 cash collateral usage con-

text, it would effectively destroy the prospects for reorganization of most chapter 11 debtors.[10] If a company had sufficient value in its soft collateral, at foreclosure sale valuation levels, or even orderly liquidation levels, it would be very unlikely to need chapter 11 relief in the first place. Moreover, a secured creditor who takes a blanket lien on soft collateral has to know that the collateral will fluctuate in its level. As indicated above, it is the *level* of value that is crucial for adequate protection purposes in this specific context.

■ The crucial inquiry in the § 363 context, and the purpose for which the valuation and adequate protection determinations are being made, is whether the debtors' ongoing operation which in fact keep the level of soft collateral essentially the same during the period prior to plan confirmation, or denial of confirmation, or whether some additional cash infusion of "new money" should be required to assure the secured creditor that the level of soft collateral will be maintained in the ongoing business operation. In the present case, I believe the debtors have made the requisite showing in that regard and there is no need or justification for the requiring—at this time—any additional cash infusions to provide adequate protection.

---

ence is significant when valuing assets for the purpose of determining whether a business operation can continue until a reorganization plan can be formulated.

9. I also note that Judge Queenan's emphasis and focus in *Tenney Village* on the language in § 506(a) referring to the "value of such creditor's interest" in the collateral, as being distinguished from the value of the collateral itself, is in conflict with the Supreme Court's discussion regarding that statutory provision in *United Savings v. Timbers of Inwood Forest*, 484 U.S. 365, 372, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988). This distinction was originally suggested by Judge Queenan in his article, "*Standards For Valuation Of Security Interests In Chapter 11*", 92 Com. Law Journal 18 (1987) prior to the *Timbers* decision. This view of the issue has been criticized. *See e.g.* Fortgang & Mayer, *Valuation in Bankruptcy*, 32 UCLA L.Rev. 1061, *reprinted in* 611 PLI/Comm 9, PLI Order No. A4–4374 (March 27, 1992). When Judge Queenan was presented with the valuation issue in a cash collateral con-

text, subsequent to the *Timbers* decision, he utilized at least on an alternative basis a less rigid interpretation of adequate protection. *See In re T.H.B. Corp.*, 85 B.R. 192 (Bankr.D.Mass.1988) (discussed in footnote 4 and at p. 395 *supra*).

10. Cash collateral usage in the early stages of a chapter 11 reorganization proceeding is simply unique in that if the debtor were to be required to provide dollar-for-dollar new money replacement to cover a temporary decline in the cash collateral level few debtors coming into the bankruptcy court for reorganization would be able to comply. The secured creditor could arguably force a termination of the debtor's business operations without having to grapple with the questions of its overall equity position, and the need for an effective reorganization, which are presented under § 362(d) of the Bankruptcy Code when a secured creditor seeks relief from the automatic stay to foreclose. Here, State Street Bank & Trust Company has not filed a motion for relief from the automatic stay but has only sought to prohibit the debtors' further use of cash collateral.

### The "Equity Cushion" Argument

 The foregoing formulation of the appropriate test and standard for determining adequate protection of cycling soft collateral, pursuant to sections 361 and 363 of the Bankruptcy Code, does not require that the secured claimant be protected by an "equity cushion" on an overall basis with regard to all collateral securing its loans. This is not a motion for stay relief under section 362 of the Bankruptcy Code in which such an inquiry would be appropriate. As stated above, the question of adequate protection of cycling, soft collateral presents unique considerations in the cash collateral *usage* context which do not necessarily raise the same concerns relevant to static assets that are not being "used" in the business operation.[11]

 The test with regard to usage of soft collateral is not whether the secured party took enough collateral of all kinds to protect itself prior to the bankruptcy, or more particularly whether it monitored carefully enough the level of its floating lien on soft collateral to protect itself, but rather whether what it actually *had* in terms of the level of its floating lien on its fluctuating collateral base will be preserved until a plan of reorganization is determined.

 To the extent however that the secured creditor here argues, and certain case decisions may well suggest, that an absence of an equity cushion on an overall basis is pertinent to adequate protection of soft collateral under section 363 of the Bankruptcy Code, I do find upon the record before me that the debtors have established that on an overall basis, including all collateral available to the secured creditor, whether in these estates or as provided by the secured personal guarantees of the equity holders, that there is an equity cushion at fair market and going concern values of approximately 17 percent over the secured debt involved.[12] It was stipulated at the hearing that the total secured debt of State Street Bank & Trust Company was in the amount of $4,049,000. The evidence presented establishes fair market and going concern values of the total collateral involved of $4,859,000 as of the end of November 1993.[13]

When there is a showing of an overall oversecured position of a secured creditor in the cash collateral usage context, this Court has previously ruled that the "as is necessary" language of section 363(e) of the Bankruptcy Code may justify denial of any further adequate protection in the unique situation of cash collateral (there involving rents as cash collateral) if on an overall basis the secured creditor is oversecured and protected by a clear equity cushion. *In re Rancourt*, 123 B.R. 143, 151–53 (Bankr.D.N.H.1991). *See also In re T.H.B. Corp.*, 85 B.R. 192, 194 (Bankr.D.Mass.1988).

### Conclusion

On the showing made by the debtors, the Court finds and concludes that the debtors have established that there is no significant danger to the secured creditor that the level of the soft collateral supporting the creditor's floating lien will not be restored within the projected period of operations of the debtors' business. Notwithstanding the conceded decline in cash flow, the debtors have estab-

---

11. In this context "static" refers to assets that do not regenerate in the ordinary course and cycle of the business operation—such as realty, equipment, machinery and the like.

12. When considering an "equity cushion" contention, this Court will look at a continuum of values, from fair market values down to forced sale values, depending on how substantial the prospects for successful reorganization are in the particular case; the time elapsed from the filing of the case and the degree of progress toward a reorganization during that elapsed time; and various other pertinent factors. In the present case, as indicated above, I believe the present financial downturn is an aberration due to the agreed-upon move to the Arizona facility and that these debtors have substantial prospects for a successful reorganization.

13. The data as of the end of November 1993 takes into account the $540,000 of decline in soft collateral at that point.

lished that State Street Bank & Trust Company will have the appropriate adequate protection, as is necessary for the lien involved, during the further course of the debtors' operations while a plan of reorganization is being formulated and filed on or before March 1, 1994.[14] As indicated above, a separate Order to that effect has already been entered.

This determination has been made solely in the context presented, i.e., a motion for continued use of cash collateral and opposition thereto.[15] The debtors will be permitted to continue to use cash collateral for a limited period to preserve their business operation and the going concern value of their enterprise until a plan of reorganization can be formulated and be presented for consideration in accordance with the limited time frame specified. This determination will not be binding upon the State Street Bank & Trust Company or any other interested party at the time of a hearing on confirmation of a plan or plans of reorganization. At that juncture the debtors will have the full burden of establishing upon an appropriate evidentiary record the feasibility of their plan and the projected operations of the reorganized debtors under the plan.

---

14. If debtors fail to file a plan by this deadline, the Court would reconsider debtors' use of its cash collateral upon request of a creditor and possibly require cash payments to said creditor so as to maintain the secured creditor's position. *Cf. Xinde Int'l, Inc.,* 13 B.R. 212 (Bankr.D.Mass. 1981).

15. The "Debtors' Request for Findings of Fact and Rulings of Law" (Court Doc. No. 95) submitted on October 6, 1993 are denied except to the extent included within this decision.