**In the Matter of PURSUIT ATHLETIC FOOTWEAR, INC., and Riddell Athletic Footwear, Inc., Debtors.**

**SAVE POWER LIMITED, Extravest Holdings Limited and Silver Eagle Holdings Limited, Movants,**

v.

**PURSUIT ATHLETIC FOOTWEAR, INC., and Riddell Athletic Footwear, Inc., Respondents.**

**Bankruptcy Nos. 95–1424, 95–1425. Adv. No. 95–2326.**

United States Bankruptcy Court, D. Delaware.

Jan. 24, 1996.

Laura Davis Jones and Janet Z. Charlton, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, Hugh M. Ray and Jeffrey E. Spiers, Andrews & Kurth L.L.P., Houston, Texas, for Movants.

Edward M. McNally, Kent A. Jordan, John D. Demmy, and John T. Meli, Jr., Morris, James, Hitchens & Williams, Wilmington, Delaware, for Debtors.

### MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Chief Judge.

Pursuit Athletic Footwear, Inc. moves for final approval for its use of cash collateral. Relatedly, Save Power Limited, Extravest Holdings Limited, and Silver Eagle Holdings Limited move this court for adequate protection in the Chapter 11 cases of Pursuit Athletic Footwear, Inc. and Riddell Athletic Footwear, Inc., and for relief from the automatic stay. A combined final hearing on all three motions was held on December 13 and December 14, 1995.[1] Briefing was completed January 11, 1996. This is the court's decision on all three contested matters, each of which is core. 28 U.S.C. § 157(b)(2)(G), (M).

I. *Background Facts*

The following findings of fact set the stage for the three motions. Pursuit is a Delaware Corporation that sells athletic footwear and has been in existence since about 1991. Riddell Athletic Footwear owns all the outstanding stock of Pursuit. On February 15, 1994, Pursuit and Riddell became licensees that allowed them to manufacture and sell throughout the world athletic shoes and footwear under the "Riddell" trademark. The use of the "Riddell" trademark through the license has been the cornerstone of Pursuit's business since that time.

Save Power Limited is a Hong Kong manufacturer and supplier of athletic shoes. Silver Eagle Holdings owns 100% of Save Power. Pursuit and Save Power have had a business relationship since 1992. In the beginning of 1994, the parties entered into a business relationship whereby Save Power would provide both working capital and footwear to Pursuit. In February 1994, Pursuit entered into a finance and security agreement with Save Power and its sister company, Extravest Holdings Limited. Under that agreement, Pursuit acknowledged a prior indebtedness of $23 million, and received an additional loan of approximately $5 million. The agreement also contemplated that Save Power would be Pursuit's primary, if not sole supplier of shoes.

Also in February 1994, Pursuit obtained additional financing from Heller Financial. Save Power agreed to subordinate $20 million of its outstanding indebtedness and security interest in the collateral to Heller's loan. The Heller loan was thereafter paid off through a refinancing provided by Syntek Finance Corporation. Syntek is related to Pursuit, although the exact nature of the relation is disputed.

The business relationship between the Pursuit entities and the Save Power entities has been less than successful. Pursuit has lost money for at least many months since February 1994 through November 1995. It is not disputed that Pursuit has defaulted pre-petition on the finance and security agreement. However, the debtors allege that since February 1994 through sometime in 1995, Save Power failed to comply with its obligations under the agreement, and that Save Power's conduct relating to the agreement is to blame for Pursuit's poor financial performance. Among other things, Pursuit alleges Save Power gained effective management control of Pursuit after February 1994, and thereby caused Pursuit's downfall (those allegations are discussed further in Section III of this Opinion).

Pursuit Athletic Footwear and Riddell Athletic Footwear filed Chapter 11 petitions in this court on November 3, 1995. There is a foreclosure sale scheduled in Dallas, Texas, on February 26, 1996 relating to Save Power's collateral, which includes the "Riddell" license agreement, cash, inventory, receivables and equipment. The collateral comprises virtually all the pre-petition assets of Pursuit. The remainder of this court's findings of facts appear below.

---

1. On the first day of the combined hearings, after a colloquy with counsel, the court ruled that a motion to dismiss the Chapter 11 cases would be continued to an open date. Docket no. 76 at 89–90.

II. *The Cash Collateral and Adequate Protection Motions*

■ The finance and security agreement of February 1994 gave Save Power a security interest[2] in various property of Pursuit, including all "cash collateral." 11 U.S.C. § 363(a). This court entered an interim order approving Pursuit's use of cash collateral on November 21, 1995. By order dated December 18, that interim use was extended pending a decision of this court on final use of cash collateral. Since the issuance of the interim ruling, Pursuit has received approximately 90,000 pairs of shoes in its warehouses. A significant number of other shoes are in transit or are in the Far East awaiting the outcome of the present cash collateral motions.

Pursuit concedes that it must provide Save Power with "adequate protection" for the use of Save Power's cash collateral. 11 U.S.C. § 363(c)(2); § 363(e). Save Power argues that Pursuit is unable to provide adequate protection. Pursuit disagrees, and asks this court to finally approve the debtors' use of cash collateral over Save Power's objection.

In the circumstances here, Pursuit argues that if there is no actual diminution in the value of Save Power's collateral through the date of the hearing, and Pursuit can operate profitably post-petition, Save Power is adequately protected for the use of its cash collateral. 11 U.S.C. § 361; *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr.D.N.J.1993); *In re Dynaco*, 162 B.R. 389, 394–95 (Bankr.D.N.H.1993); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr.M.D.Fla.1994) (order). Save Power does not dispute this legal standard, except that Save Power adds Pursuit must show it *has* operated profitably post-petition. The court will assume this additional showing is required.

■ Pursuit has further agreed to grant Save Power a replacement lien on Debtor's unencumbered assets acquired post-petition to the extent of any actual diminution in the value of the collateral. Pursuit has the bur-

den to show that adequate protection has been provided. 11 U.S.C. § 363(o)(1).

A. *There Has Been No Post–Petition Diminution in the Value of the Collateral.*

In pleadings filed prior to the December 13 hearing, Save Power asserted that its collateral had declined in value. *E.g.*, docket no. 21 at 6, docket no. 51 at 15–16. In its opening post-hearing brief, Pursuit responded that the collateral increased in value. Pursuit relied on a letter stipulation the parties created specifically for the purposes of the combined hearings and concerning the value of the collateral in which Save Power has an interest, both on the petition date, and on the hearing date. According to that stipulation, Save Power agreed that the value of the encumbered collateral was no more than $8,067,000 on the petition date, and that the value of the encumbered collateral was no more than $8,310,000 on the hearing date. Pursuit properly concludes there has been no diminution of the value of Save Power's collateral. In its reply brief, Save Power's only response is that this stipulation does not show an increase in the collateral value, as Save Power only agreed that the collateral values were *no more* than the stated figures. Despite Save Power's obligation to respond to Pursuit's arguments raised in its opening brief, Save Power does not assert or point to any evidence in the record showing that the collateral value has decreased from the petition date to the hearing date. Under these circumstances, Save Power has abandoned its earlier argument that the collateral value has in fact declined during this period. *E.g.*, *New Haven Inclusion Cases*, 399 U.S. 392, 481 n. 78, 90 S.Ct. 2054, 2103 n. 78, 26 L.Ed.2d 691 (1970). Save Power's collateral has not diminished in value from the petition date to the hearing date.

B. *Pursuit Has Operated and Can Continue to Operate Profitably Post–Petition.*

Save Power argues Pursuit must show that it has operated profitably post-petition, and will continue to do so. The testimony is

---

**2.** This Opinion refers to Save Power's interest in property of Pursuit. Pursuit has filed two proceedings attacking the validity of these security interests and liens. *See generally,* section III,

*infra.* However, Pursuit has conceded that the liens are valid for the purposes of the motions discussed in this Opinion.

uncontroverted that Pursuit has been operating profitably during the short post-petition period prior to the hearing. Docket no. 76 at 184–85.

As for future months, Pursuit relies primarily on Save Power Exhibit 22B, entitled "Riddell Athletic Footwear, Inc. Projected Income Statement November 1995 through October 1996." Jeffrey M. Mattich, Chief Financial Officer for both debtors, prepared this projected budget shortly before the bankruptcy filings. The projection details the income and expenses for each of the stated months, and shows a profit for each of those months. Save Power asks this court to toss out this projection.

First, Save Power questions the numbers contained in the budget projections, however, this attack is largely conclusory. Save Power was unable on cross-examination to successfully undermine the basis for Mattich's projections, and Save Power's briefing is similarly devoid of any specific attacks on the future monthly projected figures contained in Save Power exhibit 22B for income, costs, or expenses. Save Power also offered no independent evidence controverting those future monthly projected figures.

Save Power also argues that because the debtors have failed to operate profitably pre-petition, and have failed to meet their own projections pre-petition, they cannot operate profitably post-petition. As discussed below, however, the debtors offered credible reasons why the post-petition projections would be borne out in spite of their pre-petition financial history.

Pre-petition, Pursuit relied primarily on Save Power and related entities for its supply of shoes. During the year prior to these bankruptcies, Silver Eagle itself was experiencing difficulties providing Pursuit with the inventory it needed. These difficulties adversely affected the business of Pursuit in its ability to sell shoes timely, or at all to certain of its purchasers.

Post-petition, Pursuit has changed suppliers from Save Power to other manufacturers. As a result, the per-unit price Pursuit pays for the same style of shoes has decreased 12–15%. These other manufacturers are providing a shoe of higher quality, and Pursuit will be able to sell these shoes at a higher price.

The level of orders from its customers have increased compared to that for the one year period pre-petition. All of these factors will favorably affect the income portion of the budget.

Expenses are also lower than they were pre-petition. Mattich observed that neither the chairman nor the president were being paid post-petition. The employee salary expenses are actually lower than projected, as two employees contemplated in the budget are no longer working for Riddell. Finally, the debtors believe that conduct of Save Power and related entities impacted on their pre-petition financial history.

The projection was carefully prepared by Mattich, used conservative sales figures, and accounted for debtors' financial history. Such a projection is entitled to some deference. *In re Snowshoe Co.*, 789 F.2d 1085, 1089 (4th Cir.1986). Indeed, the projection of a profit has become a reality for the first month. On this record to date, this court will not conclusively presume the debtors can never operate profitably just because they lost money pre-petition. The debtors have introduced essentially uncontroverted evidence on the profitability issue—this is sufficient here.

Save Power overemphasizes the caveat of the Third Circuit Court of Appeals to bankruptcy judges that adequate protection requires more than an opportunity to recoup its loss of collateral base through the potential success of a business with inherently risky prospects. *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 567 (3d Cir. 1994). In that Chapter 11 case, Swedeland was developing a golf course and residential project in Crystal Springs, New Jersey. Pre-petition, Carteret Federal Savings Bank supplied Swedeland's acquisition and development financing, and took first mortgage on the realty. Post-petition, the bankruptcy court subordinated Carteret's first position lien to that of a superpriority lien granted to First Fidelity Bank pursuant to 11 U.S.C. § 364(d). There was absolutely no question that the value of Carteret's interest in the debtor's property had been diminished as a result of the superpriority lien. The only question was whether the additional consideration offered by the debtor Swedeland con-

stituted adequate protection under 11 U.S.C. § 364(d)(1)(B).

Thus, the issue in *Swedeland* was completely different from the issue here—whether Save Power is entitled to additional consideration in the first place. Moreover, in *Swedeland*, the evidentiary hearing on the adequate protection issue occurred seven months after the petition date. The record established that the debtor's sales projections for the first five months of its Chapter 11 proceedings were not met, and cash flow projections were also deficient. 16 F.3d at 566. That record is in stark contrast to the one established here. Save Power is adequately protected at this time.

### III. *The Pending Texas Action Will Continue*

■■■ The Save Power entities have filed a motion pursuant to 11 U.S.C. § 362(d) for relief from the automatic stay. The motion actually requests two types of relief, which must be considered separately.

The first request for stay relief is to "allow them to take all actions necessary to prosecute, defend and protect [their] interests in the Texas Federal Court action."

On August 11, 1995, an state civil action entitled *Riddell Athletic Footwear v. Save Power Limited* was removed to the United States District Court for the Northern District of Texas on the basis of diversity jurisdiction ("the Texas action"). The plaintiffs in that action, Pursuit and Riddell, alleged that the defendants, Save Power Limited, Silver Eagle Holdings Limited, The Grande Holdings Limited and Extravest Holdings Limited, tortiously interfered with the plaintiffs' contractual and business relationships and breached various contractual duties. The Grande Holdings Limited is an entity that obtained a controlling interest of Silver Eagle in September 1994. The plaintiffs also sought a declaratory judgment that the Save Power's lien was subordinate to that of Syntek's, and that therefore Save Power could not foreclose on its collateral. Two weeks later, the plaintiffs filed an application for a

preliminary injunction to enjoin the defendants from foreclosing on the collateral, including the "Riddell" license. Save Power counterclaimed and filed an application for a preliminary injunction to enjoin Pursuit from dissipating assets in which Save Power allegedly had an interest.

On September 27, the Honorable Terry R. Means held an evidentiary hearing on the cross-motions. On October 6, Judge Means issued a 15 page order denying both applications for preliminary injunctions. Case no. 95–CV–594, docket no. 82 ("the Means Order").[3] On October 24, Judge Means ordered mediation and issued an initial scheduling order that contemplated completion of discovery in May 1996. As of November 22, 1995, there were over 100 entries in that action. On that date, the action was administratively closed due to the bankruptcies here.

■■■ Save Power's request for relief in its stay motion seeks to lift the automatic stay to allow the Texas action to go forward. Section 362(d) of Title 11 requires Save Power to show "cause" to lift the stay. In this context, there are at least three criteria the court should consider in determining whether such relief should be granted:

1. Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;

2. Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and

3. The probability of the creditor prevailing on the merits.

*Izzarelli v. Rexene (In re Rexene)*, 141 B.R. 574, 576 (Bankr.D.Del.1992). Save Power has the initial burden in proving a prima facie case of cause, which if proved, must be rebutted by Pursuit if the stay is not to be lifted. *Id.* at 577.

As to the first factor, Pursuit has filed an adversary proceeding here with allegations that are substantially identical to those in the Texas action.[4] The complaint seeks damages

---

3. The parties argue over the collateral estoppel effect of that order in this court. There is no need to address that issue, as none of Judge Means' preliminary rulings materially affect the analysis of the motions at issue in this Opinion.

4. This adversary, A–95–100, is entitled "Pursuit Athletic Footwear, Inc. v. Save Power Limited, Extravest Holdings Limited, Silver Eagle Holdings, Limited, The Grande Holdings, Limited."

based on breach of contract, fraud, breach of fiduciary duty, tortious interference. The complaint seeks the identical declaratory relief as the Texas action. In addition, the complaint seeks to avoid the security interest as a fraudulent conveyance, and equitably subordinate the defendants' claims, liens and interests. This adversary was filed on the first day of the case. Pursuit is obviously not concerned with the spectre of simultaneously pursuing its claims against the Save Power defendants while proceeding with its reorganization. These factors are sufficient to conclude that no prejudice will result from the continuation of the Texas action.

As to the second factor, there is no evidence that the hardship to the Save Power defendants considerably outweighs the hardship to the debtors.

As to the third factor, the probability of the creditor prevailing on the merits, there has already been a financial finding that Pursuit has not shown a substantial likelihood of success on the merits. Means Order, at 12–13. Judge Means' finding translates sufficiently to a finding in *his* court that the Save Power defendants have at least a probability of prevailing on the merits of their defense.

The court has also considered other factors that are germane to this type of motion. Pursuit has invested significant human resources and about $800,000 in legal fees in prosecuting the Texas action to date. Common sense suggests that those investments would be best protected by allowing the Texas action to proceed.

Judge Means has already heard testimony on the merits of the allegations and issued a 15 page decision. He has thus advanced significantly along the judicial learning curve. A pre-trial schedule has been set which indicates a timely adjudication of the Texas action can be effected. The adversary action here is subject to a motion to withdraw reference, and a related motion for a determination of the core nature of the proceeding. These motions will only incur further expense and delay for the parties, and for the United States District Court Judge addressing this reference issue. Thus, judicial efficiency also argues strongly in favor of lifting the stay.

In its briefing, Pursuit has not offered any arguments why cause has not been shown, and on balance, the court finds that the above factors strongly favor lifting the stay to allow the Texas action to proceed. However, the Texas action involves affirmative action of a legal and equitable nature sought by the Save Power defendants. Certainly, Save Power may not execute on any legal judgment in its favor without this court's permission. As to the equitable relief sought, the record is not sufficiently developed to rule whether the stay should be lifted. Therefore, the automatic stay is lifted to allow the Texas action to proceed to determine the claim of the plaintiffs against the defendants, if any, and the claim and lien of the defendants against the plaintiffs, if any.

**IV.** *Relief From Stay to Allow the Foreclosure to Proceed is Denied*

Save Power's motion pursuant to 11 U.S.C. § 362(d) also requests relief to:

a. Allow it to take all actions necessary to foreclose on the collateral ("the foreclosure relief");[5] and

b. To permit the continuation of the foreclosure sale, *nunc pro tunc*, from November 6, 1995 until February 26, 1996.[6]

A.P. No. 95–2326, docket no. 1, at 17. The motion alleges two statutory bases for such relief: 11 U.S.C. § 362(d)(1) and 11 U.S.C. § 362(d)(2).

**A.** *No Cause Exists to Lift the Stay.*

■ Section 362(d)(1) states in relevant part:

[T]he court shall grant relief from stay . . . —

(1) for cause, including the lack of adequate protection of an interest in property of [a] party in interest.

---

**5.** The stay motion defines the "collateral" as Pursuit's existing and after-acquired inventory, accounts, contracts, documents, chattel paper, general intangibles, equipment and all proceeds and products thereof.

**6.** The *nunc pro tunc* request for relief is moot if the foreclosure relief is denied.

Save Power asserts its interest in the collateral is not adequately protected. Based upon the discussion in Section II of this Opinion, the court finds this ground for cause without merit.

Save Power also asserts other types of cause exist. First, Save Power asserts the debtors violated an order of Judge Means to maintain certain funds in a traceable account. Save Power has not articulated the basis for this court having jurisdiction to make such a ruling about Judge Means' order. Moreover, as a matter of comity, since the stay as to the Texas action has been lifted, it would be inappropriate for this court to consider the violation issue.

Second, Save Power asserts the debtors violated at least one provision of this court's interim cash collateral order relating to furnishing proof of insurance by a certain specified date. While Save Power's factual assertion is correct, the violation appears to have been created by a simple misunderstanding on Pursuit's part. Moreover, the violation has since been cured. Finally, this violation hardly rises to the level sufficient to constitute cause for lifting the stay.

Save Power's third basis for cause relates to Pursuit's alleged dissipation of collateral pre-petition. Assuming this dissipation to have occurred, it is adequately addressed in section II of this Opinion, and not independent grounds for cause.

Similarly, the court finds Save Power's other asserted bases for cause to be without merit.

B. *The Collateral is Necessary for an Effective Reorganization.*

■ Section 362(d)(2), the second basis for Save Power's requested foreclosure relief, states:

The court shall grant relief . . .—

\*      \*      \*      \*      \*      \*

(2) with respect to a stay of an act against property . . . , if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

With respect to the § 362(d)(2)(A) requirement, and for the limited purpose of this stay

motion, Pursuit concedes it does not possess equity in the collateral.

With respect to the § 362(d)(2)(B) requirement, since Save Power has shown a lack of equity, the burden of proof is on Pursuit to show that the collateral is necessary to an effective reorganization. 11 U.S.C. § 362(g)(2). Save Power essentially concedes that the collateral is necessary to an effective reorganization, and the court so finds. However, Save Power argues that as a legal matter, Pursuit must show that it has a reasonable prospect for a reorganization, and that as a factual matter, Pursuit has not shown such a prospect.

■ On the legal issue, Save Power is correct. Pursuit must show that it has a reasonable prospect for a reorganization to show that the property is necessary to such a reorganization. *E.g., In re 160 Bleecker Street Assoc.,* 156 B.R. 405, 410–11 (Bankr. S.D.N.Y.1993).

On the factual issue of whether Pursuit has a reasonable prospect of reorganization, both parties recognize the leading case of *United Savings Assoc. of Texas v. Timbers of Inwood Forest,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), which connects the proof the debtor must show of a reasonable prospect with the chronological stage of the Chapter 11 case. During the first four months of the case, the "lack of any realistic prospect of effective reorganization will require § 362 relief." *Id.* at 376, 108 S.Ct. at 633. (footnote omitted). Here, the evidentiary hearing on this issue occurred one month into the cases. Needless to say, the parties sharply disagree as to whether the debtors have a realistic prospect of an effective reorganization.

Pursuit Exhibit 17 illustrates Pursuit's view of several plan scenarios without outside funding. With a cash flow ranging from about $100,000 to $300,000 per month (depending on the allowed amount of claims), Pursuit can fund a plan that pays claims in full, with interest, in ten years. According to the cash collateral budget, debtors project sales for the period November 1995 through October 1996 of $7,475,000, and net income for that one-year period of $157,047. Save Power Exhibits 22A, 22B. Obviously (and

Pursuit concedes as much), Pursuit's prospect for reorganization of the type contemplated by Pursuit Exhibit 17 is premised on increases in its net sales. Save Power fairly asks why this court should believe Pursuit has a realistic prospect of increasing these net sales.

Pursuit asserts it can greatly increase gross and net sales, and in particular, that analyses conducted for Save Power support this view. They do not.

For instance, a November 1994 Ernst & Young financial review of the Silver Eagle Group states *Riddell* anticipates volumes of $25 to $30 million per year in gross sales. Pursuit Exhibit 13 at 27. Indeed, Ernst & Young states that "the [Riddell] forecast appears aggressive based on the company's past performance." *Id.* at 34. Pursuit also refers to a valuation of the license agreement performed by Herbert Walker of Price Waterhouse. That valuation uses projected gross sales figures increasing from $21.3 million in year one to $32.2 million in year four. That valuation does not, as Pursuit asserts, find that these projected sales figures are obtainable. Indeed, the valuation states in block letters that "this projected financial information was prepared based upon information received.... Accordingly, Price Waterhouse LLP cannot and does not express an opinion on the fairness of the data." Affidavit of Herbert E. Walter, Exhibit C (Dec. 7, 1995).[7]

Pursuit relies on other factual arguments for its conclusion that it can sufficiently increase sales to fund a plan without new money. Pursuit has proven that some increase in sales is realistic. *See generally* Section II.B. (discussing the change in circumstances from pre-petition to post-petition). However, while it is a close call, the court finds that Pursuit has not met its burden to show a realistic prospect of a sufficient increase in sales to fund a reorganization without new money.

However, Pursuit has shown a realistic prospect of reorganization with new money, either through secured financing, or an equity investment. Ernest Wood, Jr., Chairman of the board of directors of both debtors, listed six institutions interested in providing post-petition financing, and other parties interested in providing an equity infusion. Since Pursuit is now entitled to final use of cash collateral, the prospect of secured financing is enhanced. While the extent of such financing is not known, at this early stage of the reorganization, *Timbers* and its progeny teaches that such uncertainty does not work to the detriment of the debtors on the section 362(d)(2)(B) issue. With such new money, and the increase in sales, Pursuit has shown a realistic prospect of successfully reorganizing.

In conclusion, considering the early stage of these Chapter 11 cases, the court finds Pursuit has met its burden that there is a realistic prospect of increases in Pursuit's net sales, a realistic prospect of "new money" either in the form of debt or equity, and thus a realistic prospect of reorganization within a reasonable period of time. The foreclosure relief is denied.

### V. *The Case Management Relief*

As an alternative to the foreclosure relief, Save Power requests that these cases demand strict judicial oversight and management. First, Save Power objects to the use of cash collateral for the payment of professional fees. That objection is preserved until such time as Pursuit properly notices a motion for the payment of such fees pursuant to the applicable provisions of the Bankruptcy Code. Second, Save Power requests this court impose a firm timetable upon the debtors. No such relief will be granted at this time.

### VI. *Conclusion*

An order in accordance with this Opinion is attached.

### *ORDER*

AND NOW, January 24, 1996, for the reasons stated in the attached Memorandum Opinion, IT IS ORDERED:

1. The debtors' use of Save Power's cash collateral is APPROVED on a final basis. Save Power is granted a replacement lien on Debtor's assets acquired post-petition to the extent of any actual diminution in the value of the collateral.

---

**7.** The court does not appreciate Pursuit's misrepresentations of the record.

The use restrictions listed in paragraphs one and two on page two of the initial cash collateral order (docket no. 29) continue to be in effect. The reporting information required by paragraphs one through six on page three of the initial order also continue to be in effect.

2. Save Power's motion for adequate protection, filed November 15, 1995 is **DENIED**, except as stated in paragraph one above.

3. The motion of Save Power Limited, Extravest Holdings Limited and Silver Eagle Holding Limited pursuant to 11 U.S.C. § 362 to allow them to take all actions necessary to foreclose on the collateral, and to permit the continuation of the foreclosure sale, *nunc pro tunc,* from November 6, 1995 until February 26, 1996, is **DENIED.**

4. The automatic stay of 11 U.S.C. § 362(a) is lifted effective January 25, 1996 to allow the civil action pending in the United States District Court for the Northern District of Texas (Fort Worth) entitled *Riddell Athletic Footwear v. Save Power Limited,* Case no. 95–CV–594 to proceed for the following purposes through final judgment:

a. To determine any dispute concerning the Bond Order of October 17, 1995 (docket no. 95).

b. To determine the claim of the plaintiffs against the defendants, if any, and the claim and lien of the defendants against the plaintiffs, if any.

Any judgment in that action may not be executed upon without further order of this court.